FIRST DIVISION
DECEMBER 01, 2008

No. 1-07-0490

| | | |
|---|---|---|
| JOSEPH POLISZCZUK and CHARLES C. POLISZCZUK, father and next friend of MARIE POLISZCZUK, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| | ) | No. 02 M2 0733 |
| v. | ) ) | |
| KATHRYN A. WINKLER, | ) ) | Honorable Roger G. Fein, |
| Defendant-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

On September 30, 2000, a motor vehicle driven by defendant Kathryn A. Winkler struck a motor vehicle occupied by Joseph and Marie Poliszcuzk in the rear. Plaintiffs Joseph Poliszczuk, age 17 at the time of the accident, and Charles C. Poliszczuk, father and next friend of Marie Poliszczuk, age 15 at the time of the accident, brought this action in the circuit court of Cook County seeking to recover damages for injuries Marie and her brother Joseph sustained as a result of the motor vehicle collision. Defendant admitted negligence prior to trial. The case proceeded to a jury trial on the issues of causation and damages, and on September 12, 2006, the jury rendered verdicts in favor of plaintiffs. The jury awarded Marie a total of $30,100, allocated as follows: $24,100 for past and future medical expenses, $6,000 for past and future pain and suffering, $0 for "disability experienced and reasonably certain to be experienced in the future,"

and $0 for "[l]oss of a normal life experienced and reasonably certain to be experienced in the future." The jury awarded Joseph a total of $9,000, allocated as follows: $7,000 for past and future medical expenses, $2,000 for past and future pain and suffering, $0 for "disability experienced and reasonably certain to be experienced in the future," and $0 for "[l]oss of a normal life experienced and reasonably certain to be experienced in the future."

Plaintiffs filed a posttrial motion for a new trial, arguing that the jury's verdicts were against the manifest weight of the evidence. In that regard, plaintiffs argued that the jury verdicts were "internally inconsistent," and inadequate. In the alternative, plaintiffs' posttrial motion sought an *additur*. The trial court denied plaintiffs' posttrial motion and plaintiffs appeal.

BACKGROUND

On September 30, 2000, Joseph and Marie Poliszczuk were driving home from a friend's house a short time before midnight. Joseph drove while Marie was seated in the front passenger seat of the motor vehicle. At about 11:45 p.m., Joseph brought his vehicle to a stop at a stoplight located at the intersection of Barrington Road and 59th Avenue in Barrington, Illinois. There is nothing in the record of this case to indicate what direction the vehicles were traveling in or what roadway the vehicles were on. While stopped at the intersection, the vehicle was suddenly struck by another vehicle operated by defendant.

As noted, the case proceeded to a jury trial on the issues of causation and damages. The following evidence was presented.

Marie testified that she was 15 years old at the time of the accident. Prior to the accident, she was very active and "danc[ed] constantly all the time." She testified that she had been a

2

dancer since she was two years old and was in her high school's Pom Pom dance group. Marie testified that her "one passion, the one thing [she] absolutely love[d] doing more than anything," was dancing. She testified that she had studied and engaged in private lessons in ballet, tap, jazz, hip-hop, lyrical, and modern dance, and that she regularly performed in dance recitals. Marie testified that she aspired to be a professional dancer and that prior to the accident, desired to major in dance in college.

She testified that on September 30, 2000, she was a passenger in a motor vehicle driven by her brother Joseph. While driving home from a friend's house, Joseph brought his vehicle to a stop at a stoplight located at the intersection of Barrington Road and 59th Avenue in Barrington, Illinois. At about 11:45 p.m., while stopped at the intersection, the vehicle was suddenly struck in the rear by another vehicle operated by defendant. Again, there is no evidence in the record before us as to the direction of the vehicles or the roadway in which the vehicles were traveling. Marie testified that she was thrown forward and snapped back into the front passenger seat with great force as a result of the collision. Nothing in the record of this case, including Marie's testimony at trial, indicates whether Marie wore a seatbelt at the time of the collision.[1] She testified that at the time of the collision she was in shock and was slow to react to alight from the vehicle. She testified that the front driver-side door of the vehicle was damaged and that Joseph

---

[1] The only mention of whether Marie wore a seatbelt at the time of the collision, was made when Dr. Spiros Stamelos, plaintiff's expert witness, who's testimony is reiterated below, was asked to assume through a hypothetical that Marie wore a seatbelt at the time of the collision.

3

exited the vehicle through the sunroof. Joseph then came to the front passenger side of the vehicle and opened the door for Marie to exit. Marie testified that her brother's vehicle was pushed about 100 feet through most of the intersection as a result of the collision. Marie then described the condition of her brother's vehicle after the impact. Marie was shown photographs, marked as plaintiffs' exhibits Nos. 1 and 2, of her brother's vehicle taken in the driveway of her parents' home, the day after the accident. She testified that the entire trunk of the vehicle was "smashed in." The rear window was shattered. The rear seats had been pushed up against the front seats of the vehicle. The two front seats were twisted and were angled toward their respective doors because of the impact. Plaintiffs' exhibits Nos. 1 and 2 were then placed into evidence without objection. We observe however, that plaintiffs' exhibits Nos. 1 and 2, are not included in the record on appeal.

Marie testified that her parents arrived at the scene of the accident shortly after the impact and that emergency ambulatory services arrived at the scene shortly after that. Emergency medical personnel performed basic diagnostic testing on Marie and Joseph, such as blood pressure and pulse readings. Marie's parents then transported her and Joseph to Good Shepherd Hospital in Barrington.

Marie testified that she began to feel pain in her neck and back while in her parents' vehicle on the way to the hospital. When they arrived at the hospital, both Marie and Joseph were examined by medical doctors and received X-rays and were given over-the-counter pain medication. Marie testified that she and her brother remained at the hospital several hours for observation and were discharged early the next morning.

Marie testified that she began to feel great pain in her neck and back the day following the accident. She testified that she was unable to move her neck and that the pain radiated throughout her torso. She treated her pain with ice, heat, and over-the-counter pain medications. She testified that the pain lasted for a couple of days and began to subside. She testified that, in the weeks following the accident, she was unable to perform any physical activity or dance and that watching her classmates participate in gym class was "very hard." After several weeks, Marie was able to slowly perform physical activity, but she testified that she was not capable of doing any back bends or forward bending or backward bending or even side-to-side movements.

Marie testified that her neck pain eventually subsided, but that she continued to have lower back pain in the lumbar area. She testified that her lower back pain was still present at the time of trial on September 11, 2006, six years after the accident.

Marie testified that she sought further medical attention about a week and a half after the accident from her family physician, Dr. Richard Davis, an internist at Good Shepherd Hospital. Marie did not testify how many times she saw Dr. Davis, whether Dr. Davis performed a physical examination of her, or whether he prescribed her any treatment. She only testified that Dr. Davis referred her to Dr. Jack Perlmutter, a board-certified orthopedic surgeon. Dr. Perlmutter first examined Marie on January 24, 2001. After examining Marie, Dr. Perlmutter prescribed physical therapy. Marie testified that physical therapy consisted of the physical therapist massaging the portion of her back that was painful and that her physical therapist would have her perform back-strengthening exercises with a medicine ball. She testified that physical therapy was very painful and did not alleviate or help her back pain.

Marie testified that she was eventually able to return to dancing, but that she was unable to do back bends, or bend forward. She testified that bending her back forward or backward would result in a radiating pain down her right leg. She testified, however, that dancing helped her back pain, if she did not bend her back. Marie testified that she was never able to regain the flexibility she had prior to the accident.

Dr. Perlmutter recommended that she take time off from dancing. Marie testified that she took two years off from dancing and that, during that period, was unable to do many everyday things, such as household and personal chores. Marie testified, "[I]t's hard for me to put my socks on or my shoes on or tie my shoes. I cannot clean the bathtub. I can't do it. I'll cry. I can't take out the garbage. I can't lift anything heavy. It's very hard for me to go grocery shopping, if I have to get dog food, a case of water, or a case of pop. It's extremely hard for me to do that. I can't play volleyball with my friends *** ." Marie testified further that there are "private things, sexual activity" that she cannot do because of her back pain.

Marie recalled Dr. Perlmutter performing a procedure, called a discogram, on her lower back. She recalled lying facedown on a stretcher. She remembered that Dr. Perlmutter inserted large, thick needles into her spine and that she had excruciating pain during the procedure.

Finally, Marie testified that as a result of her injury she could never have the dance career that she always desired. She explained that, "yes, maybe I can do dancing on the side in a light way, maybe even teach little kids in a nice easy way, but I cannot do anything strenuous the way a professional dancer would."

Charles Poliszczuk, father of Marie and Joseph, testified at trial. He testified that on

6

September 30, 2000, he received a phone call from his children that they had been involved in a motor vehicle collision. He arrived to the scene shortly thereafter and observed his son's vehicle in the middle of the intersection of Barrington and 59th. He testified that the rear of the vehicle had been compressed about 20 to 25 inches. He also testified that the front passenger seats had twisted and were angled from their original positions. Charles testified that emergency medical services arrived and took their vital signs, such as blood pressure and pulse readings. Shortly thereafter, he transported Marie and Joseph to the emergency room at Good Shepherd Hospital in Barrington.

He testified that medical personnel examined his children and took X-rays at the hospital. Marie and Joseph remained at the hospital for three or four hours, and were then discharged.

Charles testified that neither of his children had back problems prior to the September 30, 2000, accident. He explained that prior to the accident, Marie was always "on the go." She was always dancing and participating in Poms. He testified that because of her injury, Marie stopped dancing for at least a year and during that time, her back pain progressively worsened. He testified that prior to the accident, Marie was fairly good at performing chores around the house, but that after the accident, she stopped doing chores. He also testified that Marie does not carry her own luggage, lift the garbage can, or even clean the bathtub.

Charles also testified about the limitations he observed in his son Joseph as a result of the accident. He testified that prior to the accident, his son was an avid go-cart racer. He testified that after the accident, he would help Joseph out of the go-cart, because Joseph was unable to alight from a go-cart under his own strength. He testified that after Joseph raced he had to "hold

7

[Joseph] in an upright manner until his body adjusted to being in an upright manner" so that Joseph could begin to walk. Charles testified that Joseph eventually had to stop racing. Charles also testified that before Joseph left for college, he had difficulty getting up in the morning and would "walk like an old man" for several minutes until his back warmed up. Finally, Charles testified that Joseph had trouble lifting things that Charles, himself, had no trouble lifting. At the time of trial, Joseph had been away at college in Arizona for four years, and Charles could not testify as to his son's limitations or current level of pain.

At oral argument before this court, plaintiffs stated that Joseph's testimony is not included in the record of this case because no court reporter was present to transcribe the testimony. Nothing in the record or the briefs before this court relates the substance of Joseph's testimony.

Marie and Joseph's treating physician, Dr. Jack Perlmutter, a board-certified orthopedic surgeon, gave a videotaped evidence deposition in this case, which was played for the jury at trial. Dr. Perlmutter could "vaguely" remember treating Marie because his treatment of her had occurred more than five years prior to his evidence deposition in this case. Dr. Perlmutter testified that he had no recent medical examination to rely on in giving his testimony. The doctor, however, reviewed Marie's medical chart in preparation for his deposition. From her history, Dr. Perlmutter testified that Marie had been involved in a motor vehicle accident three months before his first examination of her. He testified that he examined Marie on six separate occasions at the Good Shepherd Hospital Spine Center. The first such examination occurred on January 24, 2001, and the last on July 2, 2002. At the time of the first examination, Marie complained of lower back pain, which radiated to the front of her right thigh. The pain worsened with physical activity, and

8

she was unable to participate in dancing or in her high school's pom pom dance group.

Upon physical examination, the doctor observed Marie's gait and explained she walked in a "slow guarded manner uncharacteristic of most 15 year olds." Marie's "range of motion of her lumbar spine was limited in every direction." He testified that Marie's straight-leg test was negative. Her motor function, leg strength, leg reflexes, and leg sensation were all normal. Marie presented the doctor with X-rays of her lower back taken at the emergency room of Good Shepherd Hospital, the night of the motor vehicle accident. The X-rays revealed a compression of the superior end plate of the L3 vertebra. Dr. Permutter testified that it was "possible" that the compression was caused by the motor vehicle accident. When asked if the compression he observed could be the result of a limbus vertebra, he initially responded that at that point in time he believed it was "possible," but not likely. He testified that he suspected that the compression was not likely due to limbus vertebra because there was evidence of a kyphosis localized at L3. He explained that a "kyphosis is basically an angulation of the spine where *** the spine is bent in a forward direction."

Dr. Perlmutter testified that he ordered a metabolic bone scan, a procedure which measures the present metabolic rate in a person's skeletal system. He stated that a heightened metabolic rate indicates the presence of a fracture or a break. The metabolic bone scan returned normal, ruling out the possibility that Marie's lumbar area had a fracture or break. He testified that at that point in time, it appeared that Marie had a limbus vertebra, which changed his initial diagnosis. He then prescribed physical therapy. Marie underwent physical therapy and returned to Dr. Perlmutter on November 19, 2001, for a follow-up. Marie continued to complain of pain.

Because of her persistent back pain, Dr. Perlmutter ordered an MRI of Marie's lower back. The MRI indicated that there was a bulging disc at the L2, L3 level of the lumbar area, immediately above the limbus vertebra. Based on Marie's history, which indicated an absence of lower back pain prior to the September 30, 2000, automobile accident, and persistent back pain after the accident, Dr. Perlmutter opined that the bulging disc was "probably" caused by the accident.

Dr. Perlmutter testified that the MRI revealed that there was a narrowed disc space with degeneration and bulging at L2, L3. Dr. Perlmutter testified that although the MRI showed an abnormality, the MRI could not show whether those abnormalities were symptomatic. On January 25, 2002, Dr. Perlmutter recommended that Marie undergo a discogram for further diagnosis. Dr. Perlmutter explained that a discogram is a test where a needle is placed into the vertebral discs of the spine with X-ray control. Contrast material is then injected into the disc. The patient's response to the injection is then evaluated. Dr. Perlmutter testified that a discogram produces positive results if the procedure reproduces the patient's characteristic pain. A negative discogram should not produce a painful response.

On June 28, 2002, Dr. Perlmutter performed a discogram at two levels of Marie's lumbar region. He performed a discogram at the L3, L4 level, as a control, and the results were negative. He performed a discogram at the L2, L3 level, which rendered positive results. At the time of the L2, L3 discogram, Marie's characteristic pain was reproduced and she ranked her pain level at 10, on a scale of 1 to 10, 10 being the worst level of pain. Dr. Perlmutter testified that the discogram showed that Marie's pain was caused by the abnormality present at the L2, L3 level.

Dr. Perlmutter expressed his opinion that the degeneration of the disc at the L2, L3 level

of Marie's lumbar region was caused by the September 30, 2000, automobile accident. He testified that the degeneration of the disc is not "something you normally see in a 15 year old." He also testified that the absence of pain prior to the accident was indicative of the fact that the accident caused Marie's injury. He further testified that a limbus vertebra is not normally painful.

Dr. Perlmutter then testified that all of the opinions that he expressed during his evidence deposition were to a reasonable degree of medical and surgical certainty.

Dr. Perlmutter recommended that Marie undergo a spinal fusion surgery of the L2, L3 vertebrae. He testified that a spinal fusion is a procedure were two vertebrae that normally move relative to each other are fused together so that the motion that causes pain can be eliminated. Dr. Perlmutter testified that a spinal fusion procedure would cost at least $30,000.

As noted, Dr. Perlmutter testified that Marie's last date of examination was July 2, 2002. He expressed no opinion as to Marie's present condition. He expressed no opinion as to Marie's prognosis. At no point during his evidence deposition did the doctor discuss Joseph's injuries or his prognosis.

Dr. Spiros Stamelos, a board-certified orthopedic surgeon also testified at trial. Dr. Stamelos did not treat Marie or Joseph but, rather, was retained by plaintiffs to offer expert testimony regarding Marie's and Joseph's injuries. Dr. Stamelos examined Marie on May 26, 2006. Using a model of a human spine, Dr. Stamelos described how torsion which is the act of being twisted, could affect and damage vertebral discs. He testified that a traumatic episode such as the September 30, 2000, motor vehicle collision could cause spinal torsion, and could lead to vertebral disc damage. In coming to his conclusion, Dr. Stamelos was shown a photograph of

11

Joseph's automobile after the collision and was asked to assume that the front driver-side seat was twisted in the accident and that Marie wore a seatbelt. He opined that based on the assumption of those facts, the September 30, 2000, accident caused a torsion in Marie's spine, leading to the damage of her L2, L3 disc.

Dr. Stamelos reviewed the medical records of both Marie and Joseph Poliszczuk from "the time they were children," in preparation for his testimony. Dr. Stamelos testified that because both Marie and Joseph were relatively young, their medical records consisted mainly of their medical treatment relating to the September 30, 2000, automobile accident and their treatment for the same. Dr. Stamelos reviewed medical records from Dr. Perlmutter's examination of Marie and the medical records of another physician, who he did not identify at trial. He also reviewed radiographic films. Among the radiographic films, was the MRI of Marie's lumbar spine taken on August 12, 2005. Dr. Stamelos testified that an MRI procedure is a computer-generated magnetic resonance soft tissue imaging test, and that the test is 80% reliable. Dr. Stamelos also reviewed past X-rays of Joseph's lumbar spine (the date of Joseph's X-rays were not provided by the doctor) and a December 21, 2001, MRI of Marie's lumbar spine.

Dr. Stamelos testified that Marie's 2001 and 2005 MRIs showed that she had a normal spine for a woman of her age, except for the L2, L3 disc pathology. The MRIs showed a darkness at the L2, L3 level which the doctor explained "is the water content, which is called discasion, dehydration, degeneration, meaning it was breaking down." Dr. Stamelos testified that there was "no other explanation" for the L2, L3 disc degeneration other than the 2000 automobile accident. From Marie's 2001 MRI, Dr. Stamelos testified that there was "some unusual anatomy"

12

at the L2, L3 level. He testified that the unusual anatomy indicated that a number of abnormalities could be present, including a limbus vertebra. He testified that a limbus vertebra is not "normally" painful. From Marie's 2005 MRI, Dr. Stamelos testified that it was clear that the L2, L3 disc was degenerating. He pointed out that every disc in Marie's spine appeared white in the MRI scan, except for the L2, L3 disc, which appeared black. He testified that the L2, L3 disc caused Marie's pain and discomfort, which also explained Marie's right leg pain.

Dr. Stamelos then explained his prognosis. Dr. Stamelos testified, "if [Marie] was 50 or 60, I would say that people can accommodate, which means that they can live with their back pain. They will have back pain and they will just live with it, and avoid certain activities; and hopefully, as time goes by, their activities will be reduced. But when you have a young girl that is active at the age of 20, in 20 years from now, this disc will be bone to bone, and she will be very limited, so you'll have *** the prognosis is if she lives 10, 20 years from now, she will have so much problem with this disc, she might have to have it fixed."

Dr. Stamelos testified that he agreed with Dr. Perlmutter's recommendation of a spinal fusion "with today's standards of medicine." However, he disagreed with Dr. Perlmutter's recommendation that Marie undergo the fusion at her age. He explained, "I think she has to do what they call behavior modification and go through life, and when the pain becomes so serious that it interferes with everything *** it could be in 2 years, but it could be in 10 years; it could be in 15 years *** . She has a discogram; she has pain; the disc is damaged. It will never be normal. It's a permanent condition. It cannot be made into a normal disc again." The doctor explained further, "once the disc integrity is damaged, the disc will never be normal and it will proceed on

13

this course of degeneration and progression *** . The disc is not normal; therefore, it's never going to be normal. It's abnormal. It's bulging. It's got a tear in the annulus. It is beginning to collapse. It's degenerating around the periphery. So the disc has started its downhill course." He opined that Marie would inevitably need a spinal fusion, but again expressed his opinion that it was too early to perform the procedure.

At the May 26, 2006, examination Marie complained of tight hamstrings, soreness, and limitations of motion in her lower back. She also reported that her pain was intermittent and occured when she performs certain activities, and it also depended on seasonal conditions.

Dr. Stamelos also testified regarding the discogram performed by Dr. Perlmutter. He testified that normal discs will not accept dye, and will not inflate, because the pressure in a healthy disc is too great. If the disc is damaged, it will accept dye, and inflate "like a balloon," producing the sensation of pain. Dr. Stamelos testified that the test is used to identify if a particular disc is the cause for a patient's pain. He then testified that Marie's injury was permanent.

Dr. Stamelos also testified in regard to Joseph's injuries. He testified that he reviewed Joseph's medical records. Dr. Stamelos testified that he never examined Joseph because Joseph was attending college in Arizona. From the medical records, Dr. Stamelos testified that Joseph was the driver of the vehicle that was struck by defendant's vehicle on September 30, 2000. He testified that after the accident, Joseph saw Dr. Davis, the Poliszczuk's family doctor, who referred Joseph to Dr. Perlmutter. Relying on Dr. Perlmutter's medical notes, Dr. Stamelos testified that Dr. Perlmutter found that Joseph had a bulging L4, L5 disc and an injured L5, S1

14

disc. Dr. Perlmutter's medical notes are not included in the record of this case. Dr. Stamelos opined that Joseph's injuries were permanent and were proximately caused by the September 30, 2000, motor vehicle collision. He testified that both Marie's and Joseph's medical bills were reasonable and necessary. Finally, Dr. Stamelos testified that all of the opinions that he expressed during his testimony were to a reasonable degree of medical and surgical certainty.

Defendant's expert witness, Dr. Avi Bernstein, a board-certified orthopedic surgeon, gave his testimony in an evidence deposition in this case, which was played for the jury at trial. In preparation for his testimony, Dr. Bernstein reviewed Marie's medical records and conducted a physical examination. Dr. Bernstein opined that Marie had a preexisting congenital condition known as a limbus vertebra. He testified that limbus vertebra "occur to a vertebra in development" and "is not an uncommon finding, and it causes certain radiographic abnormalities which are picked up on x-ray or MRI scan[s] or CT scan[s] and can be confused with something that might be causing pain." He testified that a limbus vertebra, by itself, does not cause pain and does not require surgery. Dr. Bernstein also found that Marie had "a narrow disc with degenerative changes associated with that limbus vertebra, which is a also common finding associated with a limbus vertebra." Dr. Bernstein testified that a limbus vertebra can occur as a certain vertebrae matures. He testified that vertebrae have cartilaginous endplates and that, as human beings mature, that cartilage ossifies. Due to pressures of the disc in some patients, there is an opportunity for a disc to put pressure on the front corner of the vertebra, and a small percentage of patients will develop a crack in the cartilaginous plate. He testified that the process occurs without pain. Dr. Bernstein also testified that because a limbus vertebra causes the

15

endplate of a vertebra to be abnormal, "the disc has an opportunity to dry out and desiccate" and that the disc features degeneration. He testified that this leads to a narrowing of the disc, whereby the disc "becomes more stable." Dr. Bernstein testified that Marie's 2001 MRI shows that the anterior corner of her L3 vertebra was irregular, which was consistent with a limbus vertebra. He testified that there was nothing about the appearance of the vertebra in the 2001 MRI to suggest trauma. Dr. Bernstein testified that the metabolic bone scan performed by Dr. Perlmutter also suggested that Marie's condition was a long-standing and inactive condition, and not the result of trauma. He testified that a metabolic bone scan will show evidence of a fracture for at least a year and that the metabolic bone scan performed on Marie, which was negative, was performed in January of 2001, within four months' time of the September 30, 2000, motor vehicle collision.

Dr. Bernstein testified that he physically examined Marie on October 22, 2004. Upon physical examination, Marie reported that she had sharp pain in her lower back and that the pain was constant. She reported that she had episodes of worsening pain and that the pain was completely unpredictable. She also stated that her pain occurred at least once a week or every other week and that it would occur at any time during the day or night, with or without activity. Dr. Bernstein observed that Marie was a "healthy, young-appearing woman in no acute distress." She appeared "reasonable and normal." She exhibited no signs of pain guarding, and she sat comfortably during Dr. Bernstein's entire evaluation. Dr. Bernstein noted no pain behavior during the examination. Dr. Bernstein observed Marie rise from her chair to standing without difficulty. She demonstrated a "completely normal" gait. She was able to walk on her toes and her heels. Marie exhibited a "full, unrestricted range of motion of her spine." She was able to

bend forward easily, reaching her palms to her toes. She demonstrated excellent flexibility. There was no reversal of rhythm on straightening, which indicated that there was no pain guarding. Dr. Bernstein testified that patients that have mechanical disc problems could not usually rise to a prone position "without climbing up their legs with their hands or throwing their hips forward." Marie demonstrated full extension when she bent backward and had full lateral deviation. Again, she exhibited no pain guarding when she extended her back. Marie did, however, complain of some tenderness to palpation. Dr. Bernstein explained that palpation is a process by which a medical doctor presses on the bones and muscles of the low back with his fingers to determine whether there are spasms in the muscles and whether the patient responds to pain upon touch. Dr. Bernstein noted that the tenderness occurred at the L4 level, which is about four inches below the L2, L3 level. Marie did not complain of pain from palpations at the L2, L3 level.

Dr. Bernstein testified that there was no evidence of muscle spasms. Her reflexes at her knees and ankles were normal. Marie had no atrophy in her lower extremities. Dr. Bernstein administered a straight-leg exam, both in the seated and supine positions, which were normal. Dr. Bernstein did note some tightness in the hamstring area. Marie had excellent strength and normal sensation.

Dr. Bernstein opined that the findings in Marie's radiographs indicated that the abnormality in her L2, L3 lumbar area was preexisting and that it was not caused or aggravated by the September 30, 2000, motor vehicle collision. He testified that Marie would not need any care in the future with respect to her injury, that her congenital abnormality has no functional bearing on her lower back, and that Marie was not a candidate for a lumbar fusion surgery.

17

Dr. Bernstein had an opportunity to review Marie's 2005 MRI. He stated that the MRI showed no change in Marie's spine from the time of her 2001 MRI.

Dr. Bernstein also reviewed the report prepared by Dr. Stamelos. He testified that he disagreed with Dr. Stamelos' findings. Specifically, Dr. Bernstein stated as follows: "Dr. Stamelos' opinion was that the findings on her studies are the result of a trauma. He failed to recognize that this is a limbus vertebra. He presumed that the – in his report – that the only way to have this radiographic finding was through [an automobile] accident, and he implied that other activities such as sports or athletics or bending or lifting couldn't cause the findings on the scan. So it to – to me, those comments just don't fit what we know about disc abnormalities, about medicine, about injury."

On cross-examination, Dr. Bernstein testified that the discogram performed by Dr. Perlmutter did not confirm that Marie had a damaged disc at the L2, L3 level. He testified that pressure could be placed on any disc in the spine and cause pain, regardless of injury. The doctor held all of his opinions to a reasonable degree of medical certainty. Marie's and Joseph's medical bills were admitted into evidence. Marie's medical bills were $11,599.61, and Joseph's medical bills were $6,933.

At the close of evidence and after closing arguments, the jury returned verdicts in favor of plaintiffs and against defendant. As noted, the jury returned a verdict in favor of Marie in the amount of $30,100, allocated as follows: $24,100 for "[t]he reasonable expense of necessary medical care, treatment, and services received and the present cash value of the reasonable expenses of medical care, treatment and services reasonably certain to be received in the future,"

$6,000 for "[t]he pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries," $0 for "[t]he disability experienced and reasonably certain to be experienced in the future," and $0 for "[l]oss of a normal life experienced and reasonably certain to be experienced in the future." Further, as noted, the jury returned a verdict in favor of Joseph in the amount of $9,000, allocated as follows: $7,000 for "[t]he reasonable expense of necessary medical care, treatment, and services received and the present cash value of the reasonable expenses of medical care, treatment and services reasonably certain to be received in the future," $2,000 for "[t]he pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries," $0 for "[t]he disability experienced and reasonably certain to be experienced in the future," and $0 for "[l]oss of a normal life experienced and reasonably certain to be experienced in the future." The jury was instructed that the term "loss of a normal life" means "the temporary or permanent diminished ability to enjoy life *** includ[ing] a person's inability to pursue the pleasurable aspects of life."

As noted, plaintiffs filed a posttrial motion for a new trial, arguing that the jury's verdicts were against the manifest weight of the evidence. As noted, plaintiffs argued that the jury verdicts were against the manifest weight of the evidence because they were "internally inconsistent." In the alternative, plaintiffs' posttrial motion sought an *additur*. The trial court denied plaintiffs' posttrial motion, and this appeal followed.

ANALYSIS

Although the parties did not raise the point on appeal, we must first discuss the instructions tendered by the trial court to the jury in this case. If finding in favor of the plaintiffs,

19

and against the defendant, the jury was instructed to fix damage awards for both plaintiffs for "the disability experienced and reasonably certain to be experienced in the future" and for "[l]oss of a normal life experienced and reasonably certain to be experienced in the future," alongside damages for past and future medical expenses and past and future pain and suffering. The verdict forms provided spaces for both.

In *Smith v. City of Evanston*, 260 Ill. App. 3d 925 (1994), the second division of this court held that the term "loss of normal life" should be utilized as an alternative to a "disability" instruction, when the term "loss of normal life" more accurately described the evidence presented at trial. In *Torres v. Irving Press, Inc.*, 303 Ill. App. 3d 151 (1999), the sixth division of this court disapproved of the use of the term "loss of normal life" in damage instructions, finding that the term "loss of normal life" was a highly subjective standard making damages especially difficult to quantify.

After *Smith* and *Torres* were decided, the 2000 edition of the Illinois Pattern Jury Instructions was published. Illinois Pattern Jury Instructions, Civil (2000). Included in that edition is an instruction that gives disability or loss of a normal life as alternatives. Illinois Pattern Jury Instructions, Civil, No. 30.04.01 (2000) (hereinafter IPI Civil (2000)). The notes on use to IPI Civil (2000) No. 30.04.01 direct that the "loss of normal life" instruction can be used rather than a "disability" instruction if the trial court determines that *Smith* is applicable and that the term "loss of normal life" more accurately describes the damages claimed. IPI Civil (2000) No. 30.04.01. The addition of instruction IPI Civil (2000) No. 30.04.01, which allows either loss of a normal life or disability to be given as an instruction, depending on the nature of the evidence

20

presented at trial, illustrates that a trial court is to determine, based on the evidence, whether "loss of a normal life" or "disability" more accurately describes the evidence at trial, and instruct the jury accordingly.

No Illinois authority, however, authorizes a trial court to give both a disability and "loss of a normal life" instruction concurrently. As instruction IPI Civil (2000) No. 30.04.01 makes clear, it is either one or the other. Instructing on both disability and loss of a normal life concurrently, could lead to jury confusion and to the prejudice of the defendant because of the potential of the award of double damages. Reversal on this basis is not necessary here because (1) there was no objection to the jury instructions on record, and (2) the defendant here suffered no prejudice from the offending instructions because the jury returned verdicts of $0 for both disability and loss of a normal life. *Thompson v. MCA Distributing, Music Corp. of America*, 257 Ill. App. 3d 988, 991 (1994) (new trial will be granted because of proper jury instructions only where a party has suffered serious prejudice from the offending instruction). Because the jury was instructed on both disability and loss of a normal life, we will address the parties' arguments in relation to both.

We turn now to the parties' arguments on appeal. Plaintiffs argue that the jury verdicts should be vacated and a new trial on damages granted because the verdicts are "internally inconsistent" and were inadequate. The plaintiffs assert that our standard of review on appeal from the denial of a motion for new trial on compensatory damages is whether the verdict was against the manifest weight of the evidence.

Defendant argues that plaintiffs incorrectly frame the issues before this court and misstate this court's standard of review with regard to the jury's verdicts. Defendant argues that the issues

21

properly before this court are: (1) whether the jury's verdicts were legally inconsistent, and (2) whether the jury's verdicts were against the manifest weight of the evidence. Citing *Redmond v. Socha*, 216 Ill. 2d 622 (2005), defendant argues that a *de novo* standard of review applies to the first issue, and a manifest weight of the evidence standard applies to the second.

In *Redmond*, the Illinois Supreme Court did address the proper standards with regard to a review of a jury's verdict. In its discussion, the court noted two lines of cases on the question of legally inconsistent verdicts in civil cases. *Redmond*, 216 Ill. 2d at 643. The first line of cases discussed "consist[ed] of those involving a single claim in which the single verdict is alleged to be internally inconsistent *** as when the damages awarded are not reasonably related to the liability found." *Redmond*, 216 Ill. 2d at 643, citing *Galloway v. Kuhl*, 346 Ill. App. 3d 844, 850 (2004) (jury's verdict imposing liability and awarding damages for disfigurement and pain and suffering was legally inconsistent with failure to award reasonable expenses of medical treatment received by plaintiff), and *Hinnen v. Burnett*, 144 Ill. App. 3d 1038 (1986) (jury's verdict awarding damages for the expense of pain medication and physical therapy was inconsistent with failure to award any damages for pain and suffering).

The second line of cases discussed "involv[ed] those in which multiple claims are made by one or more parties and where a verdict as to one claim is alleged to be inconsistent with the verdict as to another." *Redmond*, 216 Ill. 2d at 643, citing *Wottowa Insurance Agency, Inc. v. Bock*, 104 Ill. 2d 311 (1984) (verdict in favor of defendants on basis that they were acting as agents of corporations was legally inconsistent with verdict that they were liable, as individuals, for fraud based on same transaction), and *Action Construction & Restoration, Inc. v. West Bend*

22

*Mutual Insurance Co.*, 322 Ill. App. 3d 181 (2001) (jury verdict finding that defendant breached oral contract necessarily required the jury to find that the parties had a meeting of the minds, which finding was legally inconsistent with verdict that defendant obtained plaintiff's agreement by perpetuating a common law fraud).

In announcing the *de novo* standard applicable to its review in the case before it, the Illinois Supreme Court noted that the facts in *Redmond* fell into the second category. *Redmond*, 216 Ill. 2d at 643. The instant case, of course, falls into the first category. As noted, plaintiffs argue that the two verdicts rendered in the case at bar were internally inconsistent, not inconsistent with each other. The *Redmond* court made no pronouncement with regard to the standard of review applicable in cases such as the case at bar.

The standard of review applicable in cases like the one before us, consisting of those involving a single claim in which the single verdict is alleged to be internally inconsistent, is, however, well documented elsewhere in Illinois case law.

"A reviewing court will reverse a trial court's ruling on a posttrial motion for a new trial, only if the trial court abused its discretion." *Dixon v. Union Pacific R.R. Co.*, 383 Ill. App. 3d 453, 470 (2008), citing *Snover v. McGraw*, 172 Ill. 2d 438, 449 (1996). " 'In determining whether the trial court abused its discretion, the reviewing court should consider whether the evidence supported the jury's verdict.' " *Stift v. Lizzadro*, 362 Ill. App. 3d 1019, 1028 (2005), quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 455-56 (1992). In making this determination, " 'it is important to keep in mind that "[t]he presiding judge in passing upon the motion for a new trial has the benefit of his previous observation of the appearance of witnesses, their manner in

testifying, and of the circumstances aiding in the determination of credibility. " ' [Citation.]" *Stift*, 362 Ill. App. 3d at 1028, quoting *Maple*, 151 Ill. 2d at 455-56. " 'If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial *** .' " *Stift*, 362 Ill. App. 3d at 1028, quoting *Maple*, 151 Ill. 2d at 455-56. " 'A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any evidence.' " *Stift*, 362 Ill. App. 3d at 1028, quoting *Maple*, 151 Ill. 2d at 454.

Furthermore, the determination of damages is a question of fact, not law, and is within the discretion of the jury, not the court. *Snover*, 172 Ill. 2d at 447. Our supreme court has held that a jury's award of damages is entitled to substantial deference by the court and a trial court can upset a jury's award of damages only if it finds that: (1) the jury ignored a proven element of damages; or (2) the verdict resulted from passion or prejudice; or (3) the award bore no reasonable relationship to the loss sustained. *Snover*, 172 Ill. 2d at 447, citing *Gill v. Foster*, 157 Ill. 2d 304, 315 (1993); *Snelson v. Kamm*, 204 Ill. 2d 1, 37 (2003).

Properly stated, the issue before this court is whether the trial court abused its discretion when it denied plaintiffs' motion for a new trial. Plaintiffs ask us to reverse the trial court's order because (1) the zero awards for past and future disability and past and future loss of normal life with regard to both Marie and Joseph ignored proven elements of damages and, in the alternative, were inconsistent with the jury's awards for past and future medical expenses, and past and future pain and suffering; and (2) the awards were otherwise inadequate.

Before proceeding further we must address defendant's argument, contained in her brief to

24

this court, regarding what she claims is plaintiffs' position; namely, that the zero awards in this case warrant *per se* reversal. Prior to the Illinois Supreme Court's decision in *Snover v. McGraw*, 172 Ill. 2d 438 (1996), a line of Illinois cases held that an award for medical expenses without an award for pain and suffering and/or disability required reversal *per se*. See *Slavin v. Saltzman*, 268 Ill. App. 3d 392, 403 (1994); *Sands v. Glass*, 267 Ill. App. 3d 45, 50-51 (1994); *Martin v. Cain*, 219 Ill. App. 3d 110, 115 (1991); *Kumorek v. Moyers*, 203 Ill. App. 3d 908, 913 (1990). In *Snover*, our supreme court examined that line of cases and held that a jury may award pain-related medical expenses and, at the same time, may also determine that the evidence of pain and suffering was insufficient to support a further monetary award. *Snover*, 172 Ill. 2d at 448. In rejecting the reversal *per se* rule, the Illinois Supreme Court emphasized that such a determination turns solely on the facts of the case and that, under certain circumstances, an award for pain and suffering may be inappropriate. *Snover*, 172 Ill. 2d at 448. After rejecting the reversal *per se* rule, the court held that an award of medical expenses alone could still be inconsistent. *Snover*, 172 Ill. 2d at 448. The court concluded by reaffirming the traditional rules that a jury's assessment of damages is entitled to substantial deference and that a ruling on a new trial is best made by the trial court in its posttrial process. *Snover*, 172 Ill. 2d at 449. Our supreme court also noted that a reviewing court should not reverse the trial court's ruling on a posttrial motion absent an abuse of discretion. *Snover*, 172 Ill. 2d at 449.

Although plaintiffs do cite to a number of cases examined by *Snover* in the court's rejection of the reversal *per se* rule, our review of plaintiffs' brief in the case at bar reveals no advocacy of the rule. In fact, no mention of the words *"per se"* appears in plaintiffs' brief. We

25

note that plaintiffs filed no reply brief in this case and did not respond to defendant's argument regarding *per se* reversal. At oral argument, plaintiffs did not advocate application of the *per se* reversal rule and defendant appeared to abandon her position regarding plaintiffs' advocacy of the rule. In any event, it is clear that the reversal *per se* rule with regard to charges of internally inconsistent jury verdicts has been rejected in this state. *Snover*, 172 Ill. 2d at 448.

We now return to plaintiffs' contentions on appeal. As noted above, we can overturn a jury's award only if the jury ignored an element of damages, acted out of passion or prejudice, or made an award not reasonably related to loss. *Snover*, 172 Ill. 2d at 447. First, the fact that the jury chose to award no money for disability and for loss of normal life, while awarding money for medical expenses and pain and suffering, is not proof, by itself, that the jury "ignored" that element. *White v. Lueth*, 283 Ill. App. 3d 714, 718 (1996) (upheld jury award of nothing for disability, although jury awarded damages for medical expenses, and pain and suffering). See also *Snover*, 172 Ill. 2d at 447-48 (upheld jury award of nothing for pain and suffering, although jury awarded damages for pain-related medical expenses); *Stift*, 362 Ill. App. 3d at 1021 (upheld jury award of nothing for loss of normal life, although jury awarded damages for medical expenses and pain and suffering); *Orava v. Plunkett Furniture Co.*, 297 Ill. App. 3d 635, 636 (1998) (upheld jury award of nothing for disability, lost salary, and pain and suffering, although jury awarded damages for medical expenses and aggravation of preexisting condition); *Zuder v. Gibson*, 288 Ill. App. 3d 329 (1997) (upheld jury award of nothing for disfigurement and loss of normal life, although jury awarded damages for medical expenses and pain and suffering). Second, plaintiffs do not claim that the jury acted out of passion or prejudice.

Thus, the issue with respect to the zero awards comes down to the third prong of the test: were the awards "reasonably related" to the loss suffered by Marie and Joseph. *Snover*, 172 Ill. 2d at 447. When evaluating this reasonable relationship, we must keep in mind that disability and loss of normal life are separate and distinct from either past and future medical expenses or pain and suffering. Unlike economic damages, such as loss of earnings, a disability or a loss of normal life award is "not as readily as calculable in money and jurors must draw on their real life experience in making an award." *Snover*, 172 Ill. 2d at 448-49 (discussing pain and suffering).

The evidence in the record permitted the jury to conclude that Marie was not disabled and would not be in the future; likewise, the evidence in the record permitted the jury to award Marie nothing for loss of a normal life. "Where evidence is contradicted, or where it is merely based on the subjective testimony of the plaintiff, a jury is free to disbelieve it." *Stift*, 362 Ill. App. 3d at 1029, citing *Snover*, 172 Ill. 2d at 449. Dr. Bernstein, defendant's expert witness, testified that in preparation for his testimony in this case, he reviewed Marie's medical records and conducted a physical examination of Marie. Dr. Bernstein testified that Marie had a preexisting condition known as a limbus vertebra, which he described as a congenital condition. Although plaintiffs' treating physician, Dr. Perlmutter, and examining physician, Dr. Stamelos, agreed with that finding, they disagreed on everything else. Dr. Bernstein opined that a limbus vertebra, by itself, does not cause pain and does not require surgery. Dr. Bernstein testified that Marie's 2001 MRI showed that the anterior corner of her L3 vertebra was irregular, which was consistent with a limbus vertebra. He testified that there was nothing about the appearance of Marie's lumbar region in the 2001 MRI to suggest that the abnormalities found were the result of trauma. Dr.

27

Bernstein testified that the metabolic bone scan performed by Dr. Perlmutter also suggested that Marie's condition was long-standing and inactive, not the result of trauma.

Upon physical examination, Dr. Bernstein observed that Marie was a "healthy, young-appearing woman in no acute distress." She appeared "reasonable and normal." She exhibited no signs of pain guarding, and she sat comfortably during Dr. Bernstein's entire evaluation. Dr. Bernstein noted that Marie exhibited no sign of pain behavior during the examination. He observed Marie rise from a sitting position to a standing position without difficulty. She demonstrated a "completely normal" gait. She was able to walk on her toes and heels. Marie exhibited a "full, unrestricted range of motion of her spine." She was able to bend forward easily, reaching her palms to her toes. She demonstrated excellent flexibility. There was no reversal of rhythm on straightening, which indicated that there was no pain guarding. Marie demonstrated full extension when she bent backward and had full lateral deviation. Again, she exhibited no pain guarding when she extended her back. Dr. Bernstein testified that although Marie complained of some tenderness to palpation, the tenderness did not occur at the L2, L3 level of Marie's lumber region.

Dr. Bernstein found no evidence of muscle spasms. Marie's reflexes at her knees and ankles were normal, with no atrophy in her lower extremities. Dr. Bernstein found that Marie's seated and supine straight-leg exams were normal and found that Marie had excellent strength and normal sensation.

Dr. Bernstein opined that the findings in Marie's radiographs indicated that the abnormality in her L2, L3 lumbar area was preexisting and that it was not caused or aggravated

by the September 30, 2000, motor vehicle collision. He opined that Marie would not need any care in the future with respect to her injury, that her congenital abnormality has no functional bearing on her lower back, and that Marie was not a candidate for lumbar fusion surgery.

Dr. Bernstein found that Marie's 2005 MRI showed no change in her spine when compared to her 2001 MRI.

Dr. Bernstein reviewed the medical report prepared by Dr. Stamelos, and disagreed with Dr. Stamelos' findings, stating that Dr. Stamelos failed to recognize that Marie had a limbus vertebra. Dr. Bernstein also opined that the discogram performed by Dr. Perlmutter did not confirm that Marie had a damaged disc at the L2, L3 level. He testified that pressure could be placed on any disc in the spine and cause pain, regardless of the presence of an injury.

From Dr. Bernstein's testimony, the jury was free to draw reasonable inferences about Marie's past and future disability and past and future loss of a normal life. The jury was free to believe Dr. Bernstein and not Drs. Perlmutter and Stamelos. Furthermore, part of Dr. Perlmutter's testimony actually supported the jury's decision to credit Dr. Bernstein's testimony. Like Dr. Bernstein, Dr. Perlmutter also opined that Marie had a limbus vertebra after the metabolic bone scan he ordered four months after the September 30, 2000, accident, showed the absence of a fracture or a break in Marie's spine.

Likewise, although both Marie and her father testified about the restrictions in Marie's normal life, the jury was free to make its own credibility determinations and reject or accept their testimony. *Stift*, 362 Ill. App. 3d at 1029 (where evidence is "merely based on the subjective testimony of the plaintiff, a jury is free to disbelieve it"); *Snover*, 172 Ill. 2d at 448 ("[t]he jury

29

determines the credibility of witnesses and the weight to be given their testimony"). As part of its credibility determination, the jury could have considered the inconsistencies between Marie's and Charles' testimony at trial. For instance, with regard to time taken off from dancing, Marie testified that she took two years off from dancing, where Charles testified that Marie took one year off.

The jury was also free to draw reasonable inferences about Joseph's past and future disability and loss of a normal life. We again note that Joseph's testimony is not included in the record of this case, and we have no way to determine what, if anything, Joseph testified to at trial or whether he was even there. We observe therefore, that if anything supportive of plaintiffs' position is contained in Joseph's testimony, it is not contained in the record on appeal. It is well settled that any doubts arising from the incompleteness of the record will be resolved against the appellant, as it is the burden of the appellant to provide a sufficiently complete record to support a claim of error. *Truserv Corp. v. Ernst & Young LLP*, 376 Ill. App. 3d 218, 225 (2007).

The jury was free to draw a reasonable inference about Joseph's past and future disability and loss of a normal life from his father's testimony. As noted, Charles testified about the restrictions in Joseph's normal life before Joseph went to college in Arizona, including Joseph's inability to alight from a go-cart under his own strength and his walking "like an old man," for several minutes after waking. However, with regard to disability or loss of a normal life, Charles testified that because Joseph had been away at college for four years he did not know what his son's current condition was.

Furthermore, there was no current medical examination for the jury to consider in making

its determination regarding Joseph's disability and loss of a normal life. The only medical testimony as to the permanency of Joseph's injuries was provided by Dr. Stamelos, who never examined Joseph. As noted, Dr. Stamelos testified that Joseph had a bulging L4, L5 disc and an injured L5, S1 disc. In reaching his conclusion, Dr. Stamelos testified that he relied on Dr. Perlmutter's medical notes regarding Joseph. Dr. Stamelos testified that he reviewed Joseph's medical records including past X-rays of Joseph's lumbar spine. The dates of Joseph's X-rays were not provided by the doctor. Relying on Dr. Perlmutter's medical notes, Dr. Stamelos testified that Dr. Perlmutter found that Joseph had a bulging L4, L5 disc and an injured L5, S1 disc. Dr. Stamelos then testified that Joseph's injuries were permanent.

Based on the foregoing, the jury was entitled to discount Dr. Stamelos' testimony regarding the permanency of Joseph's injuries. Dr. Perlmutter, whom Dr. Stamelos relied upon in determining that Joseph's injuries were permanent, testified in this case. However, he did not testify regarding Joseph's current condition whatsoever. He did not testify that Joseph's injuries were permanent. The only documentary evidence regarding Dr. Perlmutter's treatment of Joseph are the medical bills that the plaintiffs moved into evidence to support their claims for medical bills, the last of which occurred in 2002. The lack of evidence provided to the jury as to Joseph's current condition can support a verdict of $0 for disability or loss of a normal life.

Furthermore, had defendant objected, Dr. Stamelos' testimony regarding the permanency of Joseph's condition would have been barred. It is well settled in Illinois that an "expert's opinion is only as valid as the bases and reasons for the opinion." *Soto v. Gaytan*, 313 Ill. App. 3d 137, 146 (2000), citing *Damron v. Micor Distributing Ltd.*, 276 Ill. App. 3d 901, 907 (1995).

31

"A medical expert witness may not base his opinion on guess, conjecture, or speculation." *Soto*, 313 Ill. App. 3d at 146, citing *Scholle v. Continental National American Group*, 44 Ill. App. 3d 716, 721 (1976). Pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), the trial court closely examines proposed opinion testimony from a scientific expert to determine whether it bears sufficient indicia of reliability before the testimony is submitted to the jury. *Soto*, 313 Ill. App. 3d at 146-47. With regard to medical expert testimony concerning the permanency of a patient's injuries, although not an exhaustive list as each case depends on its own facts, trial courts should consider (1) the length of time since the last examination; (2) the length of time the patient was in treatment with the treater whose proposed testimony is at issue; (3) the nature of the patient's injuries or conditions; (4) the type of treatment received by the patient; and (5) whether a substantial change in the patient's condition has occurred between the time of the last exam and the date of trial. *Soto*, 313 Ill. App. 3d at 147.

As noted, defendant did not object to Dr. Stamelos' testimony regarding the permanency of Joseph's injuries, and the testimony did reach the jury. However, once admitted, the aforementioned factors can go to the weight to be accorded to the testimony. Ordinarily, if there is no recent medical examination and there is an objection, permanency testimony would be barred. *Knight v. Lord*, 271 Ill. App. 3d 581, 585 (1995). However, the jury still hears the testimony of the physician and can easily ignore permanency when there is no recent medical examination to support its finding. Applying the foregoing factors, we observe that Dr. Perlmutter's last examination of Joseph, which Dr. Stamelos relied upon in forming his opinion regarding permanency, appears from the medical bills included in the record to have been in 2002,

32

more than four years prior to trial. Dr. Perlmutter's examination was not recent enough for a conclusion that Joseph's injuries were permanent. See *Henricks v. Nyberg, Inc.*, 41 Ill. App. 3d 25, 28 (1976). The jury properly considered the foregoing in discounting Dr. Stamelos' testimony regarding the permanency of Joseph's injuries.

Plaintiffs then argue that the jury's verdicts were inadequate. We find nothing in the record of this case to support plaintiffs' assertions. As noted, the jury awarded Marie $30,100: $24,100 for past and future medical expenses, and $6,000 for past and future pain and suffering. The jury awarded Joseph at total of $9,000: $7,000 for past and future medical expenses, and $2,000 for past and future pain and suffering. As noted, the medical bills incurred for Marie prior to trial totaled $11,599.61, and $6,933 for Joseph.

The amounts awarded for past and future medical expenses and past and future pain and suffering fell within the confines of the evidence presented. " 'A jury's award will not be found to be against the manifest weight of the evidence merely because it can be characterized as less than generous.' " *Obsanski v. Wheeler*, 328 Ill. App. 3d 550, 555 (2002), quoting *Branum v. Slezak Construction Co., Inc.*, 289 Ill. App. 3d 948, 953 (1997).

Because we find that the jury's determination of damages was not against the manifest weight of the evidence, we also necessarily find that the trial court's refusal to grant a new trial was not an abuse of discretion.

Finally, we address plaintiff Marie's argument that she is entitled to an *additur* to her award of damages. Marie relies on medical testimony that spinal fusion surgery would cost approximately $30,000, and the jury only awarded her $24,100, for past and future medical

expenses together when her current medical expenditures were $11,599.61. However, Dr. Bernstein testified that Marie would not require any future surgery. The jurors had the right to reject all or part of Marie's medical witnesses testimony. It was up to the jury to make the credibility determinations concerning who it was going to believe. When there is conflicting testimony an *additur* is not appropriate. *Additur* is appropriate only to rectify the omission of a liquidated or easily calculated item of damages when the evidence warrants it. *Hladish v. Whitman*, 192 Ill. App. 3d 561, 565 (1989). It does not apply when the evidence is conflicting.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

WOLFSON and HALL, JJ., concur.

| Please use the following form: | ] ]  ] ] ] ] ] ] ] ] ] ] ] ] ] ] |
|---|---|
| | JOSEPH POLISZCZUK and CHARLES C. POLISZCZUK, father and next friend of MARIE POLISZCZUK, |
| | Plaintiffs-Appellants, |
| | v. |
| | KATHRYN A. WINKLER, |
| | Defendant-Appellee. |
| Complete TITLE of Case. | ] ] ] |

| Docket No. | No. 1-07-0490 |
|---|---|
| COURT | Appellate Court of Illinois First District, First Division |
| Opinion Filed | DECEMBER 01, 2008 (Month, Day and Year) |

| JUSTICES | PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court. |
|---|---|
| | WOLFSON and HALL, JJ., concur. |

| APPEAL from the Circuit Court of Cook County; the Hon: _____ | Lower Court and Trial Judge(s) in form indicated in margin: Appeal from the Circuit Court of Cook County. |
|---|---|
| Judge Presiding | Honorable Roger G. Fein, Judge Presiding. |

| For APPELLANTS John Doe of Chicago. | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. |
|---|---|
| For APPELLEES, -- | Indicate the word NONE if not represented. -------------------------------------------------------------------- |
| Smith and Smith, of Chicago. Brown, of Counsel. | Baumann & Shuldiner Chicago, Illinois 60603 Attorneys for Appellants Attn: Paul R. Shuldiner and Riaz Zaman OF COUNSEL |
| Also add atty. for third party appellants or appellees. | Ripes, Nelson, Baggot & Kalobratsos, P.C. Chicago, Illinois 60606 Attorneys for Appellee Attn: Willard L. Hemsworth III. |

_____(USE REVERSE SIDE IF NEEDED_____