FOURTH DIVISION

No. 1-09-3053

| | | |
|---|---|---|
| HARRY BALOUGH, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | 06 L 11029 |
| NORTHEAST ILLINOIS REGIONAL | ) | |
| COMMUTER RAILROAD CORPORATION, | ) | The Honorable |
| d/b/a Metra, a corporation, | ) | Arnette R. Hubbard, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Lavin and Justic Salone concurred in the judgment and opinion.

## OPINION

Plaintiff, Harry Balough, a locomotive engineer for defendant Northeast Illinois Regional

Commuter Railroad Corporation, d/b/a Metra (Metra), was injured when the latches on a

trapdoor on a Metra train cab car malfunctioned and the trapdoor fell on his head. At the time of

his injury, plaintiff was on his way to move the train car to place it into service on Metra's

commuter lines. Plaintiff sued Metra under the Federal Employers Liability Act (FELA) (45

U.S.C. §51 *et seq*. (2000)), for a violation of the Locomotive Inspection Act (LIA) (49 U.S.C.

§20701 *et seq*. (2000)), and for negligence. The trial court ruled as a matter of law that the train

was "in use" such that the provisions of the LIA applied. The jury returned a verdict in favor of

plaintiff in the amount of $500,000 in compensatory damages and nothing for disability or pain

and suffering. The jury also found plaintiff contributorily negligent and reduced the award by

40% to $300,000. However, the jury's answers to special interrogatories indicated it found that Metra violated the LIA. The trial court entered a judgment notwithstanding the verdict for the original $500,000 damages award because it found the special findings were inconsistent with the reduced damages where contributory negligence is not a defense under the LIA. Metra now appeals.

## BACKGROUND

Plaintiff began working for Metra in 1974 as a switchman/brakeman. Plaintiff later became a locomotive engineer. As a locomotive engineer, plaintiff worked for Metra's operating division, the transportation department, as head of a crew at the 18th Street yard. The transportation department does not provide repair or maintenance services. Instead, Metra's mechanical department inspects, repairs, and maintains train cab cars at the 18th Street yard.

Plaintiff's duties were to coordinate the dispersal of cars after the morning rush hour and to coordinate the assembly of trains for the evening rush hour. When the morning rush ended, the cars were dispersed at the 18th Street Yard and the mechanical department employees would lock down the tracks and use blue flags as signals so they could safely work on the equipment. The blue flags notified Transportation Department employees that they were not to use the flagged tracks or move to flagged equipment, in order to avoid injury. All of the inspection and maintenance work at the 18th Street yard is performed on the tracks, but the yard's stub track (a short track connected to other tracks only at one end) is not used for repairs because it is too close to the main line tracks. When the Mechanical Department workers finished inspecting, repairing and maintaining locomotives in the 18th Street yard, they would release them to the

2

Transportation Department, and plaintiff and his crew would move them into position for the evening rush. Plaintiff would assemble the cars and then the mechanical department would do an air test on the brakes. Then a crew would be assigned and the train would go out on the main line. Besides moving the locomotive cars within the 18th Street yard, plaintiff occasionally had to transport them on mainline tracks to or from downtown Chicago.

On the afternoon of July 6, 2005, in the 18th Street yard, plaintiff was injured while boarding locomotive 1579. Car 1579 was on the stub track. Plaintiff was assembling cars for use in the evening rush hour, and he was on his way to move car 1579 from the stub track to position it for the evening rush. Though plaintiff could not recall exactly how many cars were assembled, or were going to be assembled, with car 1579, he was generally preparing to move car 1579 into position for use in the main line rush hour traffic. There were no blue flags on either the stub track or on car 1579, and the Mechanical Department was not inspecting, repairing or maintaining it at the time. At the top of the steps up locomotive 1579 was a trapdoor with two latches. Plaintiff had to climb these steps up into the vehicle in order to move the car into position for use in the evening rush. When plaintiff climbed up the stairs on locomotive 1579, the trapdoor was up. There was a vertical bar called a "grab iron" to the right side of the opening, which plaintiff used to pull himself onto the high first step, approximately 1 1/2 feet into the car. Plaintiff reached up and gave the trapdoor a horizontal tug pursuant to the railroad's rules to make sure the latches held firm and the door seemed latched. However, as plaintiff was pulling himself up into the locomotive, the trapdoor fell and hit plaintiff on the right side of his head. Plaintiff went to the hospital and received stitches on his head.

The day after injury, plaintiff saw one of Metra's physicians, Dr. Khanna, who released him to work on July 18, 2005. However, plaintiff began suffering from kaleidoscopic and blurred vision. While plaintiff was watching a film in preparation to return to work, he experienced an ocular migraine headache blurring his vision. When plaintiff attempted to return to work in the 18th Street yard, he suffered an ocular migraine with kaleidoscopic vision. As plaintiff operated a locomotive that day, his vision became blurry and he put it into an emergency brake. Plaintiff concluded he could not safely operate locomotives.

Plaintiff had an MRI performed four days later. Plaintiff was examined by two opthalmologists, Dr. Porakala and Dr. Ticlo. Plaintiff's treating physician at the time, Dr. Ponakala, diagnosed these episodes as ocular migraines. Rule 1.6.3 of Metra's General Code of Operating Rules (Rules), under which plaintiff is covered as a locomotive engineer, required plaintiff to immediately report to Metra if he had knowledge that his hearing or vision has deteriorated and cannot be corrected, so plaintiff reported the problem to Metra. Metra then ordered plaintiff to see one of its physicians, Dr. Echols, who determined that plaintiff was not able to continue working as an engineer and took plaintiff out of work on September 18, 2005, which was plaintiff's last day of work. Metra made a formal determination on September 25, 2005, that plaintiff's medical condition disqualified him from working as a locomotive engineer. Plaintiff subsequently applied for disability benefits from the Railroad Retirement Board, which ruled he was occupationally disabled.

Plaintiff was also treated by Dr. Mayer, a neurologist, who saw plaintiff between August 12, 2005 to January 11, 2007. Dr. Mayer examined plaintiff every few months after that up to

the date of trial. Dr. Mayer testified that it was "hard to say" what plaintiff's prognosis was regarding his visual disturbances. Ocular migraine headaches are difficult to treat. Dr. Mayer hoped that they would spontaneously remit over time. However, Dr. Mayer's medical notes revealed no significant improvement for plaintiff.

Plaintiff brought a two-count action against Metra in the circuit court. Count I was for violation of the LIA, pursuant to the FELA. Count II was for negligence under the FELA and alleged that Metra failed to inspect the cab door to discover the defective door latch, failed to warn plaintiff of the defective door latch condition, and failed to properly maintain the door latch.

At trial, Terry Cordray, a licensed vocational rehabilitation counselor, testified as plaintiff's vocational expert. Cordray testified that the job of a locomotive engineer is a safety-sensitive position and that the Federal Railroad Administration has regulations covering physical requirements for engineers, including standards for good vision. Good visual ability is required because an engineer has to: (1) look at train signals regarding train movement; and (2) be observant of the employees that are working on the ground who may give hand signals to indicate their movement to the engineer. Cordray's opinion was that plaintiff could no longer be a locomotive engineer.

Dr. Richard Kraig, a neurologist from the University of Chicago, testified as plaintiff's medical expert. Dr. Kraig reviewed plaintiff's medical records and concluded that plaintiff suffered from migraine headaches and migraine with aura, caused by the head injury on July 6, 2005. Recurrences of plaintiff's visual problems were permanent, though a patient could reduce

the occurrences by controlling environmental factors or with medication. Dr. Kraig's opinion was that plaintiff should not drive a locomotive and he would not allow him to drive a locomotive if plaintiff was under his care.

Plaintiff testified that he checked the trapdoor before attempting to alight the cab car. Plaintiff reached gave the trapdoor a horizontal tug pursuant to the railroad's rules and the door seemed latched. However, when he took the first step the latches failed and the trapdoor fell on the right side of his head. Plaintiff introduced evidence of his damages from the date he was determined ineligible to work, September 12, 2005. At the time of trial in July 2009, plaintiff was 59 years old. He became eligible for a full pension from the Railroad Retirement Board upon turning 60 years old on May 21, 2010. Plaintiff's economic expert, Malcolm Cohen, testified that plaintiff's pretrial economic losses in the form of lost wages and benefits totaled $302,308. Adding future economic losses through age 60 if plaintiff retired on May 21, 2010 totaled $509,000. Up to the date of trial, plaintiff was only able to get two jobs: a dog handler, dispersing geese; and at a golf course cleaning carts, working in the shop and handling refreshments. He earned only $84,464 from September 12, 2005.

Regarding disability and pain and suffering, plaintiff testified that he spends most of his days playing with his grandson and performing chores around the house, including yard work and mowing the lawn. Plaintiff also testified he plays golf every other week during the season and was jogging every other day. He admitted he occasionally drives even though he no longer held a driver's license because of his vision problems.

Over Metra's objections, four other trapdoor incidents were admitted into evidence. On

November 3, 2001, conductor Nicholas Chou was struck on the head by a trapdoor with only one latch. On September 7, 2001, conductor Paul Buckley was struck on the back by a trapdoor with only one latch. After these incidents, Metra added a second latch to all the trapdoors in 2002. However, on April 7, 2005, conductor Robert Lindsey was struck on the head by a trapdoor with two latches in the 18th Street yard. On April 13, 2005, engineer Donnell Cooper was also hit by a trapdoor with two latches.

Metra presented the testimony of Peter Zwolfer, the superintendent of the Metra electric district, who was in charge of the 18th Street yard on the date of plaintiff's injury. Zwolfer testified that trains in the 18th Street yard are not moving or carrying passengers. One of the last steps before a train is put into use on Metra's main line is a Class 2 brake test, which cannot be done unless all the cars of a train are coupled together. The last tasks performed before a train goes out on the main line is that a crew is assigned to the train after the mechanical department and transportation department finish their work, and the Class 2 brake test is performed.

James Derwinski, the shop superintendent of the 18th Street Yard, testified that the 18th Street yard services Metra's electric lines, including the South, Blue Island, and Main Line. All electric line cars are also locomotives, and Metra performs daily inspections of all its electric line cars as required by the LIA. Derwinski testified that his personnel perform the required daily, annual, tri-annual and other required inspections of all cars, and that car 1579 was inspected every day on a daily basis prior to plaintiff's accident. The trapdoor and its latches were inspected daily to ensure no spring was broken and the latches latched in both the up and down positions. Derwinski also testified that after plaintiff's accident, he inspected the trapdoor and

the latches and he found no defects. He also found "no defects" noted on the daily inspection reports on car 1579. Derwinski concluded that the trapdoor had not been properly latched and that plaintiff failed to follow procedures and comply with Metra's rules requiring that the trap door be tested before using it.

During closing arguments, plaintiff's counsel stated to the jury that he would leave it "up to [the jury] to decide how much to give [plaintiff] for pain and suffering for the period of time he has suffered." Regarding disability, counsel stated: "I would suggest that under the disability award, that you give more, much more than what his wage loss is."

Metra moved for judgment as a matter of law on the issue of whether locomotive 1579 was "in use" under the LIA. The trial court ruled that the locomotive was in use when plaintiff was injured. Based on that ruling, the trial court instructed the jury on the LIA by giving plaintiff's instructions 32, 33, 34, and 37. These instructions were discussed during the jury conference, but the actual instructions are not part of the record before us. Also not part of the record are the instructions regarding the alternate jury forms and the alternate verdict forms. Additionally, there is no report of proceedings or bystander report for when the trial court read the instructions to the jury or explained or discussed the verdict forms and special interrogatories before the jury.

Only the completed verdict form and the special interrogatories for verdict form A and verdict form B appear in the record. The jury returned verdict form B, awarding plaintiff $500,000, without considering the question of reduction of damages due to any negligence of plaintiff, but reducing his award by 40% for his contributory negligence, resulting in an award of

1-09-3053

$300,000. The special interrogatories submitted to the jury did not indicate whether they were for verdict form A or verdict form B. The jury answered "Yes" to the following special interrogatory: "As to Plaintiff Harry Balough's FELA claim, at the time he was injured, did METRA use ordinary care to provide him with a reasonably safe place in which to do his work?" The jury answered "No" to the following special interrogatory: "As to Plaintiff Harry Balough's FELA claim, prior to the accident, did METRA have actual or constructive notice that the trapdoor latch on locomotive car no. 1579 was not reasonably safe?" The jury did not return Verdict Form A. However, as to the special interrogatory, "Did Metra violate the Locomotive Inspection Act?," the jury answered, "Yes." In response to the special interrogatory, "Did Metra's violation of the Locomotive Inspection Act cause or contribute to Plaintiff's injuries?," the jury answered, "Yes."

The court initially entered judgment on the jury's verdict and reduced award of $300,000 in damages to plaintiff. However, plaintiff and Metra both filed posttrial motions for judgment notwithstanding the verdict or a new trial. In its order of October 14, 2009, the court denied Metra's motion and granted plaintiff's motion, in which plaintiff argued that the jury's answers to the LIA special interrogatories were inconsistent with, and superseded, its general verdict on plaintiff's LIA claim, because under the LIA a reduction in damages for contributory negligence is not recognized. Thereafter, the court modified the judgment and increased the amount to $500,000 in favor of plaintiff. Metra thereafter timely appealed the judgment entered on the verdict and damages award.

ANALYSIS

9

Metra argues that the trial court erred in the following: (1) finding the locomotive was "in use" under the LIA; (2) entering judgment notwithstanding the verdict in favor of plaintiff for the entire amount of $500,000 because the jury's answers to the special interrogatories for the FELA/negligence verdict form were inconsistent with that verdict and the answers to the LIA verdict form special interrogatories were a nullity; (3) entering the $500,000 award for damages where it was logically inconsistent with an award of $0 for pain and suffering and $0 for disability; (4) allowing Dr. Kraig's expert opinion regarding the permanency of plaintiff's injury where Dr. Kraig never personally examined plaintiff and merely reviewed plaintiff's medical records; and (5) admitting evidence of the four prior trapdoor incidents on other cars. We address each argument in turn.

### I. Finding of "In Use" Under the Locomotive Inspection Act

Metra first argues that the trial court erred in finding the train car was "in use" under the LIA. The LIA provides:

> "A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances –
>
>> (1) are in proper condition and safe to operate without unnecessary danger of personal injury;
>>
>> (2) have been inspected as required under this chapter [49 U.S.C.S. §§ 20701 *et seq*.] and regulations prescribed by the Secretary of Transportation under this chapter; and
>>
>> (3) can withstand every test prescribed by the Secretary under this

chapter." 49 U.S.C. §20701.

A violation of the LIA does not give rise to a cause of action but, rather, sets a standard or rule, the violation of which gives rise to a cause of action under the FELA, and the failure to comply with that standard is negligence *per se* under the FELA. *Coffey v. Northeast Illinois Regional Commuter R.R. Corp.*, 479 F.3d 472 (7th Cir. 2007) (citing *Urie v. Thompson*, 337 U.S. 163, 188-89 n.30 (1949), *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298-99 (7th Cir. 1996), and *Lisek v. Norfolk & Western Ry. Co.*, 30 F.3d 823, 825-26 (7th Cir. 1994)). The FELA provides railroad employees a cause of action for injuries while employed by the railroad:

> "Every common carrier by railroad while engaging in commerce *** shall be
> liable in damages to any person suffering injury while he is employed by such carrier in
> such commerce ***." 45 U.S.C. §51.

Generally, a FELA action brought in state court is governed by state procedural law and federal substantive law. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002) (citing *St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 411 (1985), *Noakes v. National R.R. Passenger Corp.*, 312 Ill. App. 3d 965, 967 (2000), and *Gibbs v. Lewis & Clark Marine, Inc.*, 298 Ill. App. 3d 743, 748 (1998)). Thus, we look to federal substantive law.

As Metra points out, the phrase "in use" on the railroad's line is not defined in the LIA. The determination of whether a locomotive was "in use" at the time of the incident is a question of law. *Carder v. Indiana Harbor Belt R.R.*, 205 F. Supp. 2d 981, 984 (N.D. Ind. 2002) (citing *McGrath v. Consolidated R. Corp.*, 136 F.3d 838, 842 (1st Cir. 1998), *Crockett v. Long Island*

*R.R.*, 65 F.3d 274, 277 (2nd Cir. 1995), *Pinkham v. Main Central R.R. Company*, 874 F.2d 875, 881 (1st Cir. 1989) *Steer v. Burlington Northern, Inc.*, 720 F.2d 975, 977 n.4 (8th Cir. 1983) (citing *United States v. Thompson*, 252 F.2d 6, 9 (8th Cir. 1958)), and *Angell v. Chesapeake & Ohio Ry. Co.*, 618 F.2d 260, 262 (4th Cir. 1980)).

At the outset, we note that because the "in use" language in the LIA is identical to the language in the Federal Safety Appliance Act (FSAA) (45 U.S.C. §1 *et seq.* (1988)), recodified in 1994 as the Federal Railroad Safety Authorization Act (FRSAA) (49 U.S.C. §20302 *et seq.* (2000)), federal courts have interchangeably applied case law interpreting the LIA to the FSAA and FRSAA and the FSAA and FRSAA to the LIA. See *Phillips v. CSX Transportation, Inc.*, 190 F.3d 285, 288 n.2 (4th Cir. 1999) (citing *Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 329 (4th Cir. 1998), and *Trinidad v. Southern Pacific Transportation Co.*, 949 F.2d 187, 189 (5th Cir. 1991)); *Steer*, 720 F.2d at 977 n.3. Further, the LIA, like the FSAA, "is to be liberally construed in the light of its prime purpose, the protection of employees and others by requiring the use of safe equipment." *Lilly v. Grand Trunk R. Co.*, 317 U.S. 481, 486 (1943). Thus, we may look to federal precedent interpreting "in use" under either act for guidance.

In *Brady v. Terminal R.R. Ass'n of St. Louis*, 303 U.S. 10 (1938), the Supreme Court held that a car is "in use" under the FSAA so long as it would continue to its next destination if it passed inspection. *Brady*, 303 U.S. at 13. The railroad employee in *Brady* was injured while inspecting a car that was one of a string of cars brought by the defendant, Terminal Railroad Association of St. Louis, from St. Louis to Granite City and placed upon a "receiving" or "inbound" track of the receiving railroad company. *Brady*, 303 U.S. at 11. The car was

12

temporarily on a receiving track for inspection when he fell from the car after a grab iron came loose. *Brady*, 303 U.S. at 11-12. The purpose of the inspection was to determine whether the cars were to be accepted by the receiving railroad company. *Brady*, 303 U.S. at 11. The court found that the car was "in use" within the meaning of section 11 of the FSAA when the employee inspected it because it was only stationed on the platform temporarily for inspection and "was still in use, though motionless." *Brady*, 303 U.S. at 13. The Court reasoned as follows:

"The car had been brought into the yard at Granite City and placed on a receiving track temporarily pending the continuance of transportation. If not found to be defective, it would proceed to destination; if found defective, it would be subject to removal for repairs. It is not a case where a defective car has reached a place of repair. [Citations.] The car in this instance had not been withdrawn from use." *Id*.

We apply the decisions of the federal courts interpreting the meaning of "in use" subsequent to *Brady*, with a view toward uniform application of the law. The decisions of the federal courts interpreting a federal statute such as the FELA are controlling upon Illinois courts " 'in order that the act be given uniform application.' " (Internal quotation marks omitted.) *Wilson v. Norfolk & W. Ry. Co.*, 187 Ill. 2d 369, 374 (1999) (quoting *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 335 (1996), quoting *Bowman v. Illinois Central R.R. Co.*, 11 Ill. 2d 186, 200 (1957)).

Metra relies on two long-standing Seventh Circuit cases: *Lyle v. Atchison, T. & S.F. Ry. Co.*, 177 F.2d 221 (7th Cir. 1949), *cert. denied,* 339 U.S. 913 (1950), and *Tisneros v. Chicago & N.W. Ry. Co.*, 197 F.2d 466 (7th Cir. 1952), *cert. denied*, 344 U.S. 885 (1952), both of which

decided the issue of whether a locomotive car was "in use" under the prior Boiler Inspection Act of 1911 (45 U.S.C.A. §23), which was recodified as the LIA.

In *Lyle*, the Seventh Circuit held that the locomotive was not in use where, at the time the plaintiff suffered his injury, the engine had reached the end of its run, the engineer and fireman had left and the hostler had taken over, moving the engine to the service track and inspection pit at the roundhouse to be serviced by the plaintiff before it was again put in use. *Lyle*, 177 F.2d at 222. The plaintiff completed his servicing duties to put the engine in condition for future use on another run. *Id.* Whether there was any such subsequent use was not shown by the record. *Id.* The Seventh Circuit held:

"Clearly the use of the engine in transportation had for the time being been abandoned; its use in commerce had come to an end. Its operator had turned it over to the roundhouse employees, the hostler had taken charge and moved it to the inspection pit at the round-house and there turned it over to plaintiff whose duty it was to make the service and to prepare the engine for future further use. *** It is opposed to reality to say that under such circumstances the locomotive was in use so that the mandatory duty imposed by the Boiler Inspection Act then applied. To service an engine while it is out of use, to put it in readiness for use, is the antithesis of using it." *Id.* at 222-23.

In *Tisneros* the Seventh Circuit held the train was not in use at the time of the plaintiff's injuries. The plaintiff testified that it was his duty to look over a locomotive placed in a roundhouse stall, ascertain whether it had fire in the firebox and keep the fire going, if the engine was to go out on the road again, and, if not, put the fire out. *Tisneros*, 197 F.2d at 467. About 10

minutes after the locomotive had been placed in the stall, the plaintiff proceeded to climb the stairs of the stall. However, the steps were icy and he fell and was severely injured before he reached a position where he could see the firebox and determine whether there was a fire or not. *Id.* The Seventh Circuit held that the locomotive was not in use because:

> "[t]he locomotive was, at the time of the accident, not in use on defendant's line. It had ended its service trip at the yards and had then been taken to a stall in the round-house, there to be taken care of by plaintiff, either by building up and maintaining the fire, to have it in condition for future use, or to put out the fire, if no early return to use was contemplated." *Id.*

Metra argues that the result of *Lyle* and *Tisneros* obtains in the present case. Plaintiff, conversely, relies upon a Fourth Circuit case as being dispositive of the issue, *Angell v. Chesapeake & Ohio Ry. Co.*, 618 F.2d 260 (4th Cir. 1980). In *Angell*, the plaintiff machinist injured his left ear when he turned an exhaust valve on the air brakes in uncoupling a locomotive from another locomotive to move it to nearby tracks. *Angell*, 618 F.2d at 261. The plaintiff was going to move the locomotive to a nearby track to be coupled as part of a "consist" of several locomotives that would depart with a train later that same night. *Id.* The engine was on the "service track" and had been "blue flagged," but "all servicing, maintenance and inspection work had already been performed." *Id.* The Fourth Circuit held that whether a locomotive is "in use" on a railway system under the LIA is determined by whether the injury was directly caused by activities in inspecting, repairing or maintaining the locomotive at a maintenance facility. *Angell*, 618 F.2d at 262. In *Angell*, the locomotive was held to be "in use" where the railway had

"okayed" the locomotive for service, and it was not in further need of any repair. *Id.* The injury occurred after inspection, repair and servicing were complete and "during the uncoupling of a 'readied' engine in preparation for moving it to a nearby track to pull a train a few hours later." *Id.* The court in *Angell* noted that "[c]ongressional intent and the case law construing the statute clearly excludes those injuries directly resulting from the inspection, repair and servicing of railroad equipment located at a maintenance facility." *Id.* (citing H.R. Rep. No. 61-1974 (1911)).

The court in *Angell* specifically distinguished *Tisneros* and *Lyle*:

"The railway cites several cases where an employee, injured while performing services or repair functions on a locomotive, was denied coverage under the Act. E.g., *Tisneros v. Chicago & Northwestern Railway Co.*, 197 F.2d 466 (7th Cir. 1952); *Lyle v. Atchison, Topeka & Santa Fe Railway Co.*, 177 F.2d 221 (7th Cir. 1949); *Simpkins v. Baltimore & Ohio R.R. Co.*, 449 F. Supp. 613 (S.D.Ohio 1976). These cases are distinguishable from the present one since here all servicing, maintenance and inspection work had already been performed and the engine was being moved to its place in the consist." *Angell*, 618 F.2d at 261.

The parties dispute whether the Seventh Circuit holdings in *Lyle* and *Tisneros* or the Fourth Circuit holding in *Angell* is the majority view, and they appear to view these cases as representing different lines of precedent, or different tests, for determining whether a train is "in use" under the LIA. However, our review of federal law reveals that they do not represent different tests but, rather, different results under the same analysis; stated in the vernacular, they are merely flipsides of the same coin.

16

We note that after *Angell*, the Fourth Circuit refined the analysis and stated which factors were most important in determining whether a train is "in use" in *Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 329 (4th Cir. 1988): "to determine whether a train is 'in use' for purposes of the FSAA the primary factors we consider are where the train was located at the time of the accident and the activity of the injured party." *Deans*, 152 F.3d at 329. In *Deans*, the plaintiff was releasing handbrakes on vehicles so that the train could depart and was injured when one vehicle's handbrake failed to work correctly. *Id.* at 328. The predeparture inspection was not yet complete, though the inspection had nothing to do with the handbrake and could have been completed before the handbrakes were released. The *Deans* court held the train was in use even though it had not yet passed predeparture inspection. *Id.* at 328-29. The court stated that whether a train is in use depends on all the facts, especially the location of the train and the activity of the party that led to injury. *Id.* at 329-30. The court held that the locomotive was in use because the train "already had its engine coupled to it and was standing on a track in the rail yard in preparation for imminent departure – not in storage or waiting to be moved into a repair location." *Id.* at 330. The fact that one remaining test had not yet been completed was not dispositive. *Id.* at 329.

The Fourth Circuit in *Phillips*, a case decided under the FSAA, considered all the factors, the two primary factors being where the train was located and the activity of the injured plaintiff as enunciated in *Deans*. *Phillips*, 190 F.3d at 289 (citing *Deans*, 152 F.3d at 329). The plaintiff in *Phillips* was injured while engaging a rail vehicle's handbrake during switching operations. *Id.* at 286-87. The court stated that "the FSAA does not apply to train cars involved in switching

operations." *Id.* at 289 (citing *United States v. Seaboard Air Line R.R. Co.*, 361 U.S. 78 (1959), *United States v. Northern Pacific Ry. Co.*, 254 U.S. 251 (1920), and *Trinidad*, 949 F.2d 187). However, the holding of *Phillips* regarding switching operations was based on the Supreme Court's holding in *Seaboard*, where the Court addressed the meaning of the word "train" as used in the FSAA, and the authorities cited in *Seaboard* addressed the applicability to certain factual situations of the air brake requirement to assembled trains under the FSAA. See *Robb v. Burlington Northern & Santa Fe Ry.*, 100 F. Supp. 2d 867, 869-70 (N.D. Ill. 2000) (discussing the Fourth Circuit's holding and reliance on *Seaboard* in *Phillips*, and holding that the switching exclusion from *Seaboard* does not apply to the FSAA handbrake provision). The LIA does not distinguish between locomotive cab cars and assembled trains, as the FSAA does. Thus, the Fourth Circuit did not establish a *per se* rule that a train involved in switching operations is not in use under the LIA.

The First Circuit, like the Fourth Circuit, holds that " '[c]ongressional intent and the case law construing the statute clearly excludes those injuries directly resulting from the inspection, repair and servicing of railroad equipment located at a maintenance facility.' " *McGrath v. Consolidated R. Corp.*, 136 F.3d 838, 842 (1st Cir. 1998) (quoting *Angell*, 618 F.2d at 262). The First Circuit cites the two determinative factors of whether a locomotive is "in use," which are (1) the activity of the plaintiff at the time of the injury, and (2) the location of the locomotive at the time of the injury. *McGrath*, 136 F.3d at 842. See also *Pinkham v. Maine Central R.R. Co.*, 874 F.2d 875, 882 (1st Cir. 1989). In *McGrath*, the court held that the locomotive in question was in use, as it was not being stored on the yard track or awaiting removal to the engine house

18

for repairs but, rather, was running on the yard track and ready to move into service. *McGrath*, 136 F.3d at 842.

The Second Circuit also follows these basic principles and similarly holds that " '[c]ongressional intent and the case law construing the statute clearly exclude those injuries directly resulting from the inspection, repair, or servicing of railroad equipment located at a maintenance facility.' " *Crockett v. Long Island R.R.*, 65 F.3d 274, 277 (2d Cir. 1995) (quoting *Angell*, 618 F.2d at 262). Previously the Second Circuit had explicitly construed the term "in use" on only one occasion, in *Holfester v. Long Island R.R. Co.*, 360 F.2d 369 (2d Cir. 1966), where it held a train was in use where it was temporarily taken off the main line for a "between-run inspection," but was not removed to a repair or storage track, and the fully-loaded mail car was inactive for less than three hours. *Holfester*, 360 F.2d at 372. In *Crockett*, however, the train "was inactive on a yard track for roughly eight hours awaiting cleaning, which is hardly the sort of temporary suspension or delay in service that would warrant a finding of use," and thus the court held the train on which the employee was injured was not in use. *Crockett*, 65 F.3d at 277.

The Third Circuit also follows this precedent. In *Raudenbush v. Baltimore & O. R. Co.*, 160 F.2d 363 (3d Cir. 1947), a locomotive car was held to be in use under the prior Boiler Inspection Act where it was in the railroad switchyard, had been temporarily uncoupled from a string of cars and moved only 15 feet, where it was resting with the expectation that it would shortly be recoupled to cars. *Raudenbush*, 160 F.2d at 368. Although our research has not revealed any recent Third Circuit decisions on the issue, courts within the Third Circuit follow

19

the rule of *Angell* and *Deans*. See, *e.g.*, *Dougherty v. CSX Transportation Inc.*, 14 Pa. D. & C. 5th 284 (2010) (relying on *Angell*, *Deans* and *McGrath* in holding that the locomotive was "in use" where it was in the yard preparing to pull rail cars in interstate commerce).

The Fifth Circuit, in contrast, has adopted a bright-line inspection and release test, holding that a train is not in use until it is assembled and its inspection is complete and the train has been released. *Trinidad*, 949 F.2d at 189. The court in *Trinidad* held that the train was not in use because, at the time of the accident, the train was assembled but the inspection was not yet complete and the train was not released. *Trinidad*, 949 F.2d at 189.

The Sixth Circuit has not addressed the definition of "in use" under the LIA, but a district court has held that the "multi-factor approach better tracks the goals of the statutory scheme than the overly restrictive *Trinidad* approach and better comports with the requisite liberal construction the Court must accord such a statutory scheme." *Hinkle v. Norfolk Southern Ry. Co.*, No. 2:05-CV-574, 2006 WL 3783521, at *3 (S.D. Ohio Dec. 21, 2006). However, the *Hinkle* court held that "the factors cited as most important by *Deans* and *Phillips*, the activity of the party when he was injured and the location of the train or vehicle," while important factors, "must be considered in the context of the use of a vehicle, not the use of a train," because those cases determined only whether an entire train was in use, and not a component vehicle. *Hinkle*, 2006 WL 3783521, at *6.

The Eighth Circuit, in making "in use" determinations under the LIA, follows the holding of the Fourth Circuit in *Deans* and refers to the analysis as a "totality of the circumstances" test. See *Wright v. Arkansas & Missouri R.R. Co.*, 574 F.3d 612, 620-21 (8th Cir. 2009) (citing

20

*Deans*, 152 F.3d at 329 (holding that determination of whether a train is "in use" is to be made based upon the "totality of circumstances at the time of the injury")).

Courts in the Ninth Circuit also apparently follow the majority rule. In *Haworth v. Burlington Northern & Santa Fe Ry. Co.*, 281 F. Supp. 2d 1207, 1212 (E.D. Wash. 2003), the district court held that a train was in use for purposes of the LIA. The fact that predeparture inspection was not conducted at the time of the plaintiff's injury was without merit, as the train was in its final predeparture stages, being neither serviced nor repaired, and the court followed the majority rule, rejecting the minority view of the Fifth Circuit in *Trinidad*. *Haworth*, 281 F. Supp. 2d at 1212.

The Tenth Circuit states the test somewhat differently, though it apparently looks to the same factors in making "in use" determinations under the LIA. In *Estes v. Southern Pacific Transportation Co.*, 598 F.2d 1195 (10th Cir. 1979), it held " 'used on its line' in the statute was intended to mean used in moving interstate or foreign traffic." *Estes*, 598 F.2d at 1198. The plaintiff was a hostler assigned to move the locomotive from a "roundhouse" area, a service track where engines are fueled, sanded, and given light maintenance. *Estes*, 598 F.2d at 1196. The Tenth Circuit cited to *Lyle* and *Tisneros*, where the locomotives were also in a roundhouse, and held that a locomotive in a roundhouse is not moving interstate traffic. *Estes*, 598 F.2d at 1198-99.

District courts in the Eleventh Circuit also follow the majority rule. See *Hamilton v. CSX Transportation, Inc.*, No. CV504-12, 2006 WL 1992369 at *5 (S.D. Ga. July 14, 2006) (quoting *Pinkham*, 874 F.2d at 881 for the proposition that it is " 'well-established that locomotives being

21

1-09-3053

serviced in a place of repair are not "in use" ' ").

The Supreme Court has not revisited the definition of "in use" since *Brady* and the Seventh Circuit has not addressed the definition of "in use" under the LIA since *Tisneros*. However, although plaintiff and Metra treat the *Lyle/Tisneros* holdings of the Seventh Circuit and the Fourth Circuit's holding in *Angell* as opposing majority and minority views, it is apparent that these cases are all part of the majority view applying a multifactor analysis. We find our review of the holdings of the federal courts shows that most circuits follow the basic holdings of *Lyle/Tisneros* and *Angell* and apply a multifactor analysis, including the following factors: where the train was located at the time of the accident; the activity of the injured party; whether it is on a track in the rail yard prepared for departure or in the roundhouse for repair; whether it is being moved to a repair location or to a track for departure; and whether servicing and maintenance work have already been performed. Indeed, the court in *Angell* merely distinguished *Lyle* and *Tisneros* factually; it did not employ a different analysis. See *Angell*, 618 F.2d at 261. Only the Fifth Circuit developed its own minority bright-line test.

District courts in the Seventh Circuit have applied *Angell*. See, *e.g.*, *Zanden v. Norfolk & Western Ry. Co.*, No. 93-C-4272, 1996 U.S. Dist. LEXIS 17848, at *7 (N.D. Ill. Nov. 26, 1996) (citing *Angell*, 618 F.2d at 262, for the proposition that courts have held that a locomotive may still be considered in use even if off the main line and stationary); *Carder v. Indiana Harbor Belt R.R.*, 205 F. Supp. 2d 981, 984 (N.D. Ind. 2002) (citing *Angell*, 618 F.2d at 262, for the proposition that the LIA may provide a remedy even though the train is not actually engaged in moving interstate commerce); *Underhill v. CSX Transportation, Inc.*, No. 1:05-CV-196-TS, 2006

22

U.S. Dist. LEXIS 22685, at *17-18 (N.D. Ind. Apr. 24, 2006) (" 'The intent of the statute is to exclude from its coverage only such functions as are necessary to detect and correct those defective conditions for which absolute liability will be imposed.' " (quoting *Angell*, 618 F.2d at 262)).

Our state appellate court also recognizes *Angell* as precedent in determining whether a train is in use under the LIA. In *Edwards v. Alton & Southern Ry. Co.*, 275 Ill. App. 3d 529 (1995), the appellate court affirmed the trial court's judgment, directing a verdict in the plaintiff machinist's favor on his count under the Boiler Inspection Act (the precursor to the LIA). In *Edwards*, the plaintiff was a machinist for the defendant railroad company whose job was to inspect locomotives at the "pit" where inspections, fueling, sanding, and small repairs are done on locomotives. *Edwards*, 275 Ill. App. 3d at 530. The plaintiff was splitting a four-engine group into a two-engine group. *Edwards*, 275 Ill. App. 3d at 530. He had completed his inspection, and the track was not blue-flagged. *Edwards*, 275 Ill. App. 3d at 530. The court relied on *Angell* in its analysis in finding that the train was in use. *Edwards*, 275 Ill. App. 3d at 536-37.

Metra argues the following evidence shows that cab car 1579 was not "in use": (1) the car was not out on the main line picking up and dropping off passengers when the accident occurred but, rather, was standing on stub track number 4 in Metra's 18th Street yard awaiting a call or request to be placed in use on the commuter lines; (2) no crew had been assigned to the car to operate it on the main line; (3) no train had been assembled; (4) no air-brake test had been conducted, which is the last step before an assembled train leaves the maintenance yard and goes

23

out on the main line; (4) plaintiff was a "hostler engineer" moving, assembling and disassembling trains in the maintenance yard and not a "mainline engineer" operating trains out on the main line; (5) plaintiff was not taking the cab car out onto the main line and did not know exactly what he planned to do when he climbed into the cab car; and (6) the cab was not part of a scheduled train, nor was its departure imminent. Metra argues that there is no evidence to support plaintiff's assertion that at the time he was injured he was readying the cab car in question to be placed in use for the evening rush hour. According to Metra, at most, plaintiff testified that he generally was performing switching and putting trains together for the rush hour assembly.

However, to find a train "in use" there is no requirement that: (1) the car be on the main line actually picking up and dropping off passengers; (2) a crew be assigned; (3) the train be completely assembled; (4) an air-brake test be completed; (5) a plaintiff be only a "mainline engineer"; and (6) the cab be part of a scheduled train with an imminent departure. All the factors of the surrounding circumstances are analyzed to determine whether a locomotive is "in use," particularly the location of the locomotive and the action of the plaintiff at the time of injury. The weight of authority holds that if a train is stationary in a roundhouse waiting for or undergoing service and repair, the train is not in use. See *Lyle*, 177 F.2d at 222; *Tisneros*, 197 F.2d at 467; *Estes*, 598 F.2d at 1198-99; *Crockett*, 65 F.3d at 277. However, if the train or car has been serviced and is being moved or is ready to be moved to the main line it is in use, even if not all inspections have been completed. See *Angell*, 618 F.2d at 261; *Deans*, 152 F.3d at 328; *Wright*, 574 F.3d at 620-21; *McGrath*, 136 F.3d at 842; *Holfester*, 360 F.2d at 372. No single

1-09-3053

factor, by itself, has been held to be dispositive.[1]

Although Metra points out that the car was not part of an assembled train, this fact is more of a factor under the FSAA, and has not been a predominant factor in the analysis under the LIA. Although many cases under the FSAA or FRSAA and the LIA look to cases under both statutes for interpretation, we note that the FSAA and FRSAA sets forth a distinction between component cab cars and assembled whole trains, while the LIA does not. "The FSAA sets out safety requirements for rail 'vehicles' and separate requirements for 'trains,' that is, a line of vehicles connected behind a locomotive." *Underhill*, 2006 U.S. Dist. LEXIS 22685 at \*10. A railroad carrier is allowed to use a "vehicle" on its lines only if it is properly equipped and secured as specified in the FRSAA. 49 U.S.C. § 20302(a)(1) through (a)(3). There is a separate provision that a railroad carrier is allowed to use a "train" on its lines only if there are a sufficient number of vehicles equipped with power or train brakes. 49 U.S.C. §20302(a)(5) (2000). This distinction in the FSAA between vehicles and trains was noted by the Supreme Court in *United States v. Erie R.R. Co.*, 237 U.S. 402, 407-08 (1915) ("a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road"). Under the FSAA, there are separate "in use" inquiries depending on whether the usage of a vehicle, locomotive, or train is at issue. *Underhill*, 2006 U.S. Dist. LEXIS 22685, at \*11. In *Hardlannert v. Illinois Central R.R. Co.*, 401 Ill. App. 3d 405 (2010), we discussed *Phillips* and the distinction between railcars and trains and held that individual railcars are "in use" during

---

[1] The only exception is the Fifth Circuit, which established its own bright-line inspection and release test.

25

switching operations under the FSAA, but trains are not. *Hardlannert*, 401 Ill. App. 3d at 414-15.

In contrast, the LIA only applies to a "locomotive" and its "parts and appurtenances," and makes no such distinction between vehicles and trains. See 49 U.S.C. § 20701 (2000). Thus, Metra's reliance on the fact that the car was not part of an assembled train is somewhat misplaced. *Angell* is on point, as it was decided under the LIA, and there switching operations did not preclude a finding that the train was in use. Similar to *Angell*, in the case below plaintiff was assembling cars. The fact that plaintiff was moving a cab car to be put into use is not a factor weighing against a finding that it was in use.

Contrary to Metra's assertions, our review of the record reveals that in this case plaintiff was unequivocally preparing car 1579 to be placed in use. Plaintiff's testimony at trial was as follows:

"Q. So July 6th, 2005, car 1579, correct?

A. I believe.

Q. What happened?

A. Well, the accident happened in the afternoon ***. *** [W]e got done with all our switching, and the Mechanical Department was releasing cars to us, releasing trains to us.

We're still building up – finishing our building up of the afternoon rush hour. And I went out to the stub track to get on the equipment that was there to take those cars and put it in position for the afternoon rush hour. I never made it. I got injured on the

way to accomplish that.

Q. Let me just ask you, was there any blue flags [*sic*] on that car on the stub track on the 1579?

A. No, no.

Q. Had that car been – was the Mechanical Department either servicing it, inspecting it or maintaining it at the time you were trying to alight it and were injured?

A. No.

Q. What was that car doing sitting there? What were you going to do with that car?

A. I was going to put that in service. I was going to put that on a train."

Thus, the Mechanical Department was releasing trains and plaintiff was on his way to put car 1579 on a train to be placed in use. Also, although Metra consistently refers to plaintiff as a "hostler,"[2] apparently in an attempt to portray plaintiff's job as consisting of moving trains to service areas, plaintiff's testimony at trial that his position was locomotive engineer and that his duty was to place trains for use on the commuter lines was unrebutted by Metra. There were no blue flags on car 1579 and the car was not going to being moved to a service area but to a commuter line. The Mechanical Department was releasing trains and plaintiff was on his way to put car 1579 on a train for use on the commuter lines. Under our *de novo* review, we find the train was "in use" under the LIA under the facts of this case. Therefore, the trial court did not err

---

[2] A "hostler" is defined in Webster's Third New International Dictionary 1094 (1971) as "one who takes charge of a railroad locomotive after a run: one who moves and services locomotives in enginehouse or roundhouse territory."

in finding that the car was in use.

## II. Judgment Notwithstanding the Verdict

Metra next argues that the trial court erred in entering judgment notwithstanding the verdict in favor of plaintiff for the entire amount of $500,000. It is well settled that judgment notwithstanding the verdict should be granted only when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513 (1967). Because the standard for entry of judgment notwithstanding the verdict " 'is a high one' [citation], judgment *n.o.v.* is inappropriate if 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' [Citation.]" *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178, 854 N.E.2d 635, 652 (2006). A decision on a motion for judgment notwithstanding the verdict is subject to *de novo* review by this court. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999).

Metra argues that the court erred in entering judgment notwithstanding the verdict because the jury's answers to the special interrogatories for the FELA/negligence verdict form were inconsistent with that verdict and the answers to the LIA verdict form special interrogatories were a nullity because the jury did not return an LIA verdict. We begin our analysis by recognizing that the purpose of special interrogatories is to test a general verdict against the jury's determination as to one or more specific issues of ultimate fact. *Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 251 (2004). Upon the

28

request of a party, the trial court has no discretion but to submit a special interrogatory to the jury, as long as it is in proper form. *Northern Trust Co.*, 355 Ill. App. 3d at 251. A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned. *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002). "[A] proper special interrogatory consists of a single, direct question that, standing on its own, is dispositive of an issue in the case such that it would, independently, control the verdict with respect thereto." *Northern Trust Co.*, 355 Ill. App. 3d at 251. Section 2-1108 of the Illinois Code of Civil Procedure governs special interrogatories and provides that "[w]hen the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2-1108 (West 2008).

In determining whether an inconsistency exists, all reasonable presumptions must be exercised in favor of the general verdict. *Simmons*, 198 Ill. 2d at 556. An inconsistency exists where the special finding and the general verdict are " 'clearly and absolutely irreconcilable.' " *Simmons*, 198 Ill. 2d at 556 (quoting *Powell v. State Farm Fire & Casualty Co.*, 243 Ill. App. 3d 577, 581 (1993)). "Where the court finds the answer to the special interrogatory absolutely irreconcilable with the verdict, and if the answer to the special finding is not against the manifest weight of the evidence, the special finding controls, and a judgment may be entered based on the special finding rather than on the general verdict." *Ahmed v. Pickwick Place Owners' Ass'n*, 385 Ill. App. 3d 874, 885 (2008) (citing 735 ILCS 5/2-1108 (West 2006), and *State Farm Fire & Casualty Co. v. Miller Electric Co.*, 204 Ill. App. 3d 52, 60 (1990)). "Our supreme court has

explained that the reason underlying this rule is based upon a recognition that 'a jury more clearly understands a particularized special interrogatory than a [general verdict, which is] a composite of all the questions in a case.' " *Ahmed*, 385 Ill. App. 3d at 885 (quoting *Borries v. Z. Frank, Inc.*, 37 Ill. 2d 263, 266 (1967)). We review the trial court's finding of inconsistency *de novo*. *Ahmed*, 385 Ill. App. 3d at 885 (citing Simmons, 198 Ill. 2d at 556, and *DiMarco v. City of Chicago*, 278 Ill. App. 3d 318, 325 (1996) (applying a *de novo* standard of review)).

Before we determine whether an inconsistency exists by comparing the special findings to the general verdict, we must address Metra's contention that a general verdict was not returned in this case. Metra insists that verdict form B was a special verdict form intended only for the FELA/negligence claim and verdict form A (not returned by the jury) was the LIA verdict form, and thus there was no general verdict. However, there is nothing in the record to support Metra's argument. Plaintiff correctly maintains that a general verdict was returned in this case. The verdict form itself is titled only "VERDICT FORM B" and states generally: "We, the jury, find for Plaintiff, Harry Balough, and against Defendant, Metra." A trial court must direct a separate verdict only if there are several counts in a complaint that are based on different claims, and not where there are several counts or alternate theories of recovery based on the same claim. See 735 ILCS 5/2-1201(c) (West 2008). In this case, both the FELA negligence count and the LIA count were based on the same claim or transaction. Therefore, even had there been separate special verdict forms, as plaintiff points out, they would have been inappropriate. See *Gausselin v. Commonwealth Edison Co.*, 260 Ill. App. 3d 1068, 1077 (1994) (citing Ill. Ann. Stat., ch. 110, par. 2-1201, Joint Committee Comments, at 4 (Smith-Hurd 1983), and holding separate verdict

30

forms are appropriate only when the plaintiff alleges separate causes of action based on separate transactions or occurrences). Where several grounds of recovery are pleaded in support of the same claim, as here, a general verdict is appropriate. See 735 ILCS 5/2-1201(d) (West 2008). Thus, contrary to Metra's contention, we are merely presented with special findings accompanying a general verdict, and not a special verdict.

As such, we compare the special findings to the general verdict. We find the answers to the special interrogatories regarding liability under the LIA were inconsistent with the reduction in damages award for contributory negligence in the general verdict, as contributory negligence is not a defense under the LIA. 49 U.S.C. § 20701; *Lilly v. Grand Trunk Western R. Co.*, 317 U.S. 481, 491 (1943) (holding that the partial defenses of contributory negligence and assumption of risk are not available to the employer under FELA for a violation of the Boiler Inspection Act (the precursor to the LIA)). Thus, the jury's special findings concluding that Metra violated the LIA control, and the trial court properly amended the amount of damages to the original damages award amount with no reduction for contributory negligence.

Moreover, because Metra failed to present an adequate record, we must presume the trial court's determination was correct. Metra failed to include in the record the following: the jury instructions on the LIA; instructions regarding the two different general verdict forms; the alternative verdict form A; a transcript or bystander's report of any discussion during the jury conference regarding the special interrogatories; and a transcript or bystander's report of any explanation or discussion by the court regarding the special interrogatories and verdict forms before the jury. In the absence of a more complete record regarding the basis for the court's

31

order denying defendant's motion, we must presume that the court's action "was in conformity with the law and was properly supported by evidence," and that any doubts arising from an incomplete record should be resolved against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 393 (1984). " 'Any doubts arising from the inadequacy of the record will be resolved against the defendant.' " *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 155 (2005) (quoting *Weaver v. Midwest Towing, Inc.*, 116 Ill. 2d 279, 285 (1987), citing *Foutch*, 99 Ill. 2d at 391-92). "While we may consider the issues raised by defendants by reference to the common law record [citation], any doubts raised by insufficiencies in the record must be resolved against defendants who had the obligation to present this court with a sufficiently complete record of the trial court proceedings to support their claims of error [*Foutch*, 99 Ill. 2d at 391-92]." *Williams v. Dorsey*, 273 Ill. App. 3d 893, 896-97 (1995). "[A]s the appellant, defendant has the burden of showing error; any doubt arising from incompleteness of the record will be resolved against the appellant." *People v. Kirkpatrick*, 240 Ill. App. 3d 401, 406 (1992).

We note that Metra offers no explanation for its failure to include a report of proceedings of the trial court's reading of the instructions to the jury or of any explanation or discussion of the special interrogatories and verdict forms before the jury. "An issue relating to a circuit court's factual findings and basis for its legal conclusions obviously cannot be reviewed absent a report or record of the proceeding." *Corral*, 217 Ill. 2d at 156, 839 N.E.2d at 532 (citing *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001) ("Where the issue on appeal relates to the conduct of a hearing or proceeding, this issue is not subject to review absent a report or record of the proceeding.")). "Where the record is incomplete, the reviewing court will indulge every

reasonable presumption favorable to the judgment, order, or ruling from which the appeal is taken." (Internal quotation marks omitted.) *In re Marriage of Cepek*, 230 Ill. App. 3d 1045, 1046 (1992). Moreover, "it will be presumed that the trial court heard sufficient evidence and argument to support its decision. [Citation]." (Internal quotation marks omitted.) *In re Marriage of Cepek*, 230 Ill. App. 3d at 1046. Accordingly, given the lack of transcripts as well, we presume that the circuit court's determination complied with the law and was supported by evidence.

Here, the entry of judgment notwithstanding the verdict increasing the award to $500,000 was appropriate where it was clear that the jury's answers to the LIA special interrogatories were inconsistent with the general verdict and award of damages reduced by contributory negligence. Therefore, we affirm the entry of judgment notwithstanding the verdict against Metra on plaintiff's LIA claim and the amount of damages, as under the LIA there is no reduction for contributory negligence.

### III. Compensatory Damages Award

Metra next contends that the damages award of $500,000 in compensatory damages must be set aside because it was logically inconsistent with an award of $0 for pain and suffering and $0 for disability. Plaintiff argues the jury was justified in concluding that he proved economic losses but failed to establish any other categories of damages by a preponderance of the evidence or, alternatively, if the jury's determination was error, it was invited error because plaintiff's counsel remarked in closing arguments that the jurors give whatever they wanted for other damages. Plaintiff also argues that Metra does not have standing to ask for a new trial based on

the jury's failure to award additional damages for pain and suffering and disability because Metra was not prejudiced.

Though Metra does not specify the relief it seeks, other than we "set aside" the verdict amount of $500,000, plaintiff's posttrial motion requested either a judgment notwithstanding the verdict or a new trial. As noted earlier, the substantive law in an FELA action brought in state court is governed by federal law, but state court FELA actions are subject to state procedural rules. *Schultz*, 201 Ill. 2d at 274; *St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 411 (1985); *Gibbs*, 298 Ill. App. 3d at 748. The measure of damages in an FELA case[3] is an issue of "substance" determined by federal law. *Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 493 (1980). See also *Monessen Southwestern R. Co. v. Morgan*, 486 U.S. 330, 335 (1988) (holding "the proper measure of damages [under the FELA] is inseparably connected with the right of action, and therefore is an issue of substance" (internal quotation marks ommitted)); *Templeton v. Chicago & Northwestern Transportation Co.*, 257 Ill. App. 3d 42, 54 (1993) ("Federal law must be followed in construing [a] plaintiff's entitlement to damages in a FELA case." (citing *Brown v. Chicago & North Western Transportation Co.*, 162 Ill. App. 3d 926, 931-32 (1987))) . Thus, we determine whether substantive federal law under FELA requires an award of pain and suffering or holds that a failure to award such damages where compensatory damages are

---

[3] Although Metra draws a distinction between the FELA/negligence claim and an LIA claim in its argument concerning the verdict forms, as we noted a violation of the LIA does not give rise to a cause of action under that statute but, rather, gives rise to a cause of action under the FELA. *Coffey* 479 F.3d at 477 (citing *Urie*, 337 U.S. at 188-89 n.30, *McGinn*, 102 F.3d at 298-99, and *Lisek*, 30 F.3d at 825-26). Thus, the damages awarded are damages under the FELA.

awarded is reversible error under the FELA. However, we determine whether Metra satisfied the standard for a judgment notwithstanding the verdict or a new trial under Illinois procedural law.

Substantively, "in FELA cases [the Supreme Court] has repeatedly held that where 'there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion.' " *Dennis v. Denver & Rio Grande Western R. Co.*, 375 U.S. 208, 210 (1963) (*per curiam*) (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)). " 'Only when there is a complete absence of probative facts to support the conclusion reached [by the jury] does a reversible error appear.' " *Dennis*, 375 U.S. at 210 (quoting *Lavender*, 327 U.S. at 653).

Federal courts have rejected similar challenges by defendant railroads to jury verdicts not awarding damages for pain and suffering. The court in *Manes v. Metro-North Commuter R.R.*, 801 F. Supp. 954 (D. Conn. 1992), *aff'd*, 990 F.2d 622 (2d Cir. 1993), held the defendant railroad was not entitled to a new trial where the railroad employee was awarded over $1 million in lost earnings and medical expenses but no damages for pain and suffering, loss of enjoyment of life, or fear of future. The court ultimately concluded that the waiver rule applied and precluded the railroad from receiving a new trial based on verdict inconsistency because the defendant railroad did not timely raise the issue so that it could have been resubmitted to the jury to cure its purportedly inconsistent verdict. *Manes*, 801 F. Supp. at 960-61. However, the court stated that it "fail[ed] to comprehend how the Railroad, the *defendant* in this case, is in any way harmed by the jury's failure to award additional damages for pain and suffering to the *plaintiff*." (Emphasis in original.) *Manes*, 801 F. Supp. at 958. Further, the court observed, it was "not

aware of any case, nor has the Railroad cited such a case, in which a dissatisfied defendant successfully challenged a jury verdict as legally defective for its failure to award a plaintiff damages for pain and suffering." *Id.* The court held that the award was not necessarily inconsistent, since the jury's decision not to award pain and suffering was clearly within scope of evidence presented, in light of the conflicting expert testimony about the degree of the plaintiff's injury and its obscure psychological manifestations, and thus it was "entirely reasonable and consistent for the jury to conclude that such an injury was compensable for past and future medical expenses and lost wages but not for pain and suffering." *Manes*, 801 F. Supp. at 962.

The Eighth Circuit also rejected a similar challenge by a defendant railroad to a jury verdict not awarding such damages under FELA because "any prejudice resulting from an inconsistent verdict or the entry of judgment thereon lies solely with the plaintiff who did not raise the issue below, and has not appealed the judgment." *Lockard v. Missouri Pacific R.R. Co.*, 894 F.2d 299, 305 (8th Cir. 1990), *cert. denied*, 498 U.S. 847 (1990).

Thus, there is no substantive federal rule requiring an award of damages for pain and suffering where other damages are awarded, or holding that the failure to award such damages is reversible under the FELA. Metra has not cited any authority for overturning a verdict under the FELA based upon an alleged inconsistency for failure to award damages for pain and suffering, nor does our research reveal any.

Procedurally, as noted previously, a judgment notwithstanding the verdict should be granted only when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence

could ever stand" (*Pedrick*, 37 Ill. 2d at 510), and the trial court's decision on a motion for judgment notwithstanding the verdict is subject to *de novo* review. *McClure*, 188 Ill. 2d at 132.

Alternatively, a new trial should be granted only when the verdict is contrary to the manifest weight of the evidence. *York*, 222 Ill. 2d at 178-79. That standard is met only when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary and not based upon any of the evidence. *York*, 222 Ill. 2d at 179 (citing *McClure*, 188 Ill. 2d at 132). "It is well established that, in an appeal from a jury verdict, a reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury." *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). The determination of damages is a question of fact, not law, and is within the discretion of the jury, not the court. *Poliszczuk v. Winkler*, 387 Ill. App. 3d 474, 490 (2008) (citing *Snover v. McGraw*, 172 Ill. 2d 438, 447 (1996)). The reversal *per se* rule with regard to charges of internally inconsistent jury verdicts has been rejected in Illinois. *Poliszczuk*, 387 Ill. App. 3d at 491 (citing *Snover*, 172 Ill. 2d at 448). A jury's award of damages is entitled to substantial deference by the court and a trial court can upset a jury's award of damages only if it finds that: (1) the jury ignored a proven element of damages; (2) the verdict resulted from passion or prejudice; or (3) the award bore no reasonable relationship to the loss sustained. *Stamp v. Sylvan*, 391 Ill. App. 3d 117, 123-24 (2009) (citing *Snover*, 172 Ill. 2d at 447). We "exercise[] all reasonable presumptions in favor of the verdict, and the verdict is not legally inconsistent unless it is absolutely irreconcilable." *Tedeschi v. Burlington Northern R.R. Co.*, 282 Ill. App. 3d 445, 448-49 (1996). A court of review will not reverse a circuit court's decision with respect to a motion for a new trial unless it finds that the circuit court abused its discretion.

*Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992).

Generally, a failure by the jury to award damages for pain and suffering is not necessarily inconsistent with an award in other damage categories. *Knight v. Lord*, 271 Ill. App. 3d 581, 591 (1995) (citing *Griffin v. Rogers*, 177 Ill. App. 3d 690 (1988), *Perry v. Storzbach*, 206 Ill. App. 3d 1065 (1990), *Buttita v. Stenberg*, 246 Ill. App. 3d 1012 (1993), and *Craigmiles v. Egan*, 248 Ill. App. 3d 911 (1993)).  As this court has recognized, "the fact that the jury chose to award no money for disability and for loss of normal life, while awarding money for medical expenses and pain and suffering, is not proof, by itself, that the jury 'ignored' that element." *Poliszczuk*, 387 Ill. App. 3d at 491 (quoting *White v. Lueth*, 283 Ill. App. 3d 714, 718 (1996)).  In *Snover*, our supreme court held that a jury may award pain-related medical expenses and may also determine that the evidence of pain and suffering was insufficient to support a jury award.  *Snover*, 172 Ill. 2d at 448. "[A] jury may award pain-related medical expenses and, at the same time, may also determine that the evidence of pain and suffering was insufficient to support a monetary award." *Zuder v. Gibson*, 288 Ill. App. 3d 329, 334 (1997) (citing *Snover*, 172 Ill. 2d at 448).  " 'Where evidence is contradicted, or where it is merely based on the subjective testimony of the plaintiff, a jury is free to disbelieve it.' " *Poliszczuk*, 387 Ill. App. 3d at 492 (quoting *Stift v. Lizzadro*, 362 Ill. App. 3d 1019, 1029 (2005), citing *Snover*, 172 Ill. 2d at 449).  "The verdict cannot be considered irreconcilably inconsistent if any reasonable hypothesis supports the verdict." *Tedeschi*, 282 Ill. App. 3d at 449.  This determination is best made in a posttrial motion, and the trial court's ruling as to a new trial on this issue will not be reversed unless the court abuses its discretion. *Snover*, 172 Ill.2d at 449.

In the case below, the jury's finding that pain and suffering damages were not justified was within the range of the evidence presented and was not unreasonable and arbitrary. There was not much evidence of pain and suffering in this case. As plaintiff himself testified, he did garden work and was able to play with his grandson and play golf. Further, as plaintiff himself points out, given the evidence plaintiff's counsel did not strenuously argue for damages for pain and suffering. During closing arguments, plaintiff's counsel merely stated he would leave it "up to [the jury] to decide how much to give [plaintiff] for pain and suffering for the period of time he has suffered." Regarding disability, plaintiff's counsel stated, "I would suggest that under the disability award, that you give more, much more than what his wage loss is," but did not point to any strong evidence in support of disability. Thus, the jury could have concluded that plaintiff's own testimony was insufficient to establish a basis for an award for disability or pain and suffering though he established compensatory damages, and such a conclusion was not inconsistent.

We thus conclude Metra has failed to demonstrate that the evidence so overwhelmingly favored it that no contrary verdict based on the evidence could ever stand, and so fails to satisfy the burden for entry of judgment notwithstanding the verdict. We also conclude the trial court did not abuse its discretion in denying the alternative motion for a new trial because the jury's finding that pain and suffering damages were not justified was based on the evidence and was not unreasonable and arbitrary. Therefore, we affirm the amount of damages awarded in the amended judgment entered on the jury's verdict.

IV. Admission of Dr. Kraig's Expert Opinion

Metra also argues that the trial court erred in allowing Dr. Kraig's expert opinion regarding the permanency of plaintiff's injury because Dr. Kraig never personally examined plaintiff and merely reviewed plaintiff's medical records. Metra maintains that Dr. Kraig's opinion constituted inadmissible "subjective opinion," and "improper guess and speculation." Yet, it is well recognized that "[e]xpert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." *Snelson*, 204 Ill. 2d at 24. "The decision of whether to admit expert testimony is within the sound discretion of the trial court [citation], and a ruling will not be reversed absent an abuse of that discretion." *Id.*

Here, the trial court properly admitted the expert testimony of Dr. Kraig concerning whether plaintiff's condition was permanent. Metra's objection to Dr. Kraig's expert opinion because Dr. Kraig never personally examined plaintiff but, rather, reviewed his medical records, is not well-founded. "It is not error to permit an expert to testify regarding reports or medical tests performed by other doctors, which the expert examined in reaching his or her own opinion." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 105 (1995). "An expert witness is permitted to state an opinion based on facts not within his or her personal knowledge so long as those facts are of a type reasonably relied upon by experts in the particular field." *Iaccino v. Anderson*, 406 Ill. App. 3d 397, 382 (2010) (citing *J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.*, 108 Ill. 2d 106, 117 (1985), and *Hatfield v. Sandoz-Wander, Inc.*, 124 Ill. App. 3d 780, 787 (1984)).

Metra cites no authority for the proposition that facts in medical records are not of a type

40

reasonably relied upon by medical experts in the field. Metra's citations provide no such support. We held the expert opinion in *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 886 (1999), was inadmissible because the basis for the opinion was devoid of any factual support and entirely speculative as to how the mechanical breakdown of a tractor might have happened. Here, in sharp contrast, the bases of Dr. Kraig's opinion on the permanence of plaintiff's condition were the facts contained in plaintiff's medical records, as well as Dr. Kraig's own expertise in the field.

The federal court in *Dukes v. Illinois Central R. Co.*, 934 F. Supp. 939 (N.D. Ill. 1996), determined the admissibility of an expert's opinion in an affidavit in opposition to a summary judgment motion under the federal standard under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The basis for exclusion was not the expert's reliance on medical records without examination. The court concluded that the neurologist's methodology did not meet the *Daubert* test because he was not an expert on SLAC wrists or on the causes of CTS (which were at issue), and he had no experience in the field of ergonomics. *Dukes*, 934 F. Supp. at 947. Here, in contrast, Dr. Kraig was an expert in the same field at issue at trial, neurology.

Metra's citation to *Poliszczuk* also does not provide support for Metra's position that a medical expert cannot testify to permanency without personally examining a plaintiff. The plaintiff's expert in *Poliszczuk* testified that the brother co-plaintiff had a bulging L4, L5 disc and an injured L5, S1 disc, relying on the plaintiff's treating physician's medical notes, including past X-rays of the plaintiff's lumbar spine, but the dates of the X-rays were not provided. *Poliszczuk*, 387 Ill. App. 3d at 494-95. *Poliszczuk* is not controlling here first because this court's comments

41

regarding the admissibility of the expert testimony on permanency were *dictum*. The defense in *Poliszczuk* failed to object and the evidence was admitted, and this court stated in *dictum* that, had the defense objected, testimony regarding the permanency of the brother's condition would have been barred. *Poliszczuk*, 387 Ill. App. 3d at 495.

Second, the facts in the present case are distinguishable, in that the medical records reviewed by Dr. Kraig showed continuous treatment for plaintiff's condition for about two years, including recent examination, with no significant improvement. Concerning the permanence of an injury, our supreme court has observed that " 'a long period of time without substantial improvement is sufficient time to justify a finding that an injury is permanent.' " *Granite City Steel Co. v. Industrial Comm'n*, 97 Ill. 2d 402, 407 (1983) (quoting *Overland Construction Co. v. Industrial Comm'n*, 37 Ill. 2d 525, 531 (1967)). See also *Lane v. Industrial Comm'n*, 141 Ill. App. 3d 504, 508 (1986) (vacating the circuit court's reduction of award for permanent loss of use of claimant's right foot and reinstating the Illinois Industrial Commission's decision, holding that where continued treatment for nearly three years did not alleviate the petitioner's symptoms and she was unable to work since the accident, the Commission could reasonably conclude that she sustained a permanent injury). Thus, plaintiff's continued treatment with no significant improvement, as shown in his medical records, provided a basis for Dr. Kraig's expert opinion and its admission was not an abuse of discretion.

### V. Admission of Prior Accidents

Finally, Metra argues it was reversible error for the trial court to admit evidence of the four prior trapdoor incidents on other cars. "Generally, a prior occurrence is relevant to show (1)

the existence of a particular danger or hazard or (2) the defendant's notice of the generally hazardous nature of the accident site." *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 785 (2002). If plaintiff offers the prior accident evidence to show a particular hazard or danger, a plaintiff is only required to lay a foundation of substantial similarity between the prior and present accidents. *Mikus v. Norfolk & Western Ry. Co.*, 312 Ill. App. 3d 11, 23 (2000). The determination whether prior occurrences or accidents are substantially similar to the one at issue lies within the trial court's sound discretion. *Bachman*, 332 Ill. App. 3d at 786 (citing *Sobczak v. Flaska*, 302 Ill. App. 3d 916, 929 (1998)).

Metra argues that the trial court erred in admitting all four prior incidents involving defective trapdoors on other cars because notice of defective trapdoors on other cars is not notice of a defective trapdoor and latches on car 1579. However, Metra's argument is groundless, as there is no requirement that the very same condition or thing on the very same instrumentality be involved. Rather, " '[t]o make the proof of other independent accidents competent, the condition or thing shown to be the common cause of danger in such accidents must be the condition or thing contributing to the danger of the accident complained of.' " *Simmons v. Aldi-Brenner Co.*, 162 Ill. App. 3d 238, 246 (1987) (quoting *Moore v. Bloomington, Decatur & Champaign R.R. Co.*, 295 Ill. 63, 67 (1920)).

In *Templeton v. Chicago & North Western Transportation Co.*, 257 Ill. App. 3d 42 (1993), the plaintiff was injured by falling off a railroad bridge, and this court affirmed the trial court's admission of four prior accidents which were similar but at different sites. The prior incidents involved employees falling off other defendant railroad track bridges across the

43

defendant rail multi-state rail system between 1978 and 1982. *Templeton*, 257 Ill. App. 3d at 45. We found the admission of the four prior accidents on the basis of notice to the defendant railroad was not an abuse of discretion. *Templeton*, 257 Ill. App. 3d at 50. Similarly here, the admission of the four prior accidents on other cars, which occurred in substantially the same way as in plaintiff's case, was proper to show notice to Metra of the defective condition of the latches on the trapdoors on its locomotive cars.

Metra argues that it was error for the trial court to admit evidence of the two 2001 trapdoor incidents in particular because the incidents were four years earlier. However, Metra cites no authority for the proposition that the length of time between the prior similar incidents and the incident at issue is a factor. Our courts have allowed substantially similar prior incidents with a much greater intervening length of time. See, *e.g.*, *Sobczak*, 302 Ill. App. 3d at 929 (upholding admission of evidence of rollover accidents which property owner had witnessed more than 20 years before bulldozer rollover accident that injured the plaintiff worker).

Metra also argues the 2001 trapdoor incidents should not have been admitted because the trapdoors on those cars had only one latch, rather than two as in the instant case. However, the prior occurrences need only be substantially similar to the accident in question; they need not be identical. *Snyder v. Curran Township*, 281 Ill. App. 3d 56, 64 (1996); *Simmons*, 162 Ill. App. 3d at 245.

Metra further contends that because Derwinski, the Metra shop superintendent of the 18th Street Yard, inspected the latches after plaintiff was injured and found no defects, "the case could not go to the jury because any verdict would have been based upon improper guess, conjecture

44

and speculation requiring reversal of any jury verdict." However, Metra's cited authorities are readily distinguishable, as in *McInturff v. Chicago Title & Trust Co.*, 102 Ill. App. 2d 39 (1968), the plaintiff's decedent was found dead at the bottom of the stairs and no one witnessed the accident, and in *Bermudez v. Martinez Trucking*, 343 Ill. App. 3d 25 (2003), the semi-tractor trailer training instructor was sleeping when the driver hit a barrier on the highway and had no memory of how or why the accident occurred.

Here, the common condition or thing common to the prior accidents and plaintiff's incident was the latches on the trapdoors of Metra's train cars. Also, the defective nature of the latches was at issue, not the number of latches, and the prior accidents were substantially similar to plaintiff's incident. Moreover, plaintiff clearly testified regarding the incident, and his testimony was not based upon mere guess or conjecture. Notwithstanding Derwinski's testimony, plaintiff testified that he checked the trapdoors and the latches failed, resulting in his injury, in a manner substantially similar to the prior accidents. Thus, we find that the admission of the prior trapdoor incidents was not an abuse of discretion.

CONCLUSION

For the foregoing reasons, we hold that the train was "in use" under the LIA under the facts of this case, under the multi-factor analysis established by the federal courts. We also affirm the entry of judgment notwithstanding the verdict against Metra on plaintiff's LIA claim and the amount of damages because the jury's special findings that Metra violated the LIA was inconsistent with the general verdict reducing damages. Under the LIA there is no reduction for contributory negligence. We hold Metra has failed to satisfy the standard for a judgment

1-09-3053

notwithstanding the verdict, or for a new trial, based on the jury's failure to award any damages for disability or pain and suffering because the jury's finding was based on the evidence was not inconsistent with the damages awarded for compensatory damages. Further, the admission of Dr. Kraig's expert opinion on the permanency of plaintiff's condition was not an abuse of discretion where Dr. Kraig's opinion was based on plaintiff's own medical records, which showed continuous treatment with no significant improvement. Lastly, the admission of the four prior accidents involving latches on trapdoors was not abuse of discretion where those accidents were substantially similar to plaintiff's incident. Therefore, we affirm the modified judgment entered by the circuit court in favor of plaintiff in the amount of $500,000.

_____Affirmed.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

| | |
|---|---|
| HARRY BALOUGH, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTHEAST ILLINOIS REGIONAL COMMUTER | ) |
| RAILROAD CORPORATION, d/b/a Metra, a | ) |
| corporation, | ) |
| | ) |
| Defendant-Appellant. | ) |

No.   **1-09-3053**

**Appellate Court of Illinois**
**First District, FOURTH DIVISION**
**May 19, 2011**

**Justice Pucinski  delivered the opinion of the court with opinion.**

**Presiding Justice Lavin and Justice Salone  concurred in the judgment and opinion.**

Appeal from the Circuit Court of Cook County.
The Hon. Arnette R. Hubbard, Judge Presiding.

**COUNSEL FOR APPELLANT**

JUDGE, JAMES & KUJAWA, LLC, of Park Ridge, IL
(Jay S. Judge, Michael E. Kujawa, Thomas N. Osran, of counsel)

**COUNSEL FOR APPELLEE**

HOEY & FARINA, P.C., of Chicago, IL
(Steven P. Garmisa, George T. Brugess, Kristen E. Lukaszak, of counsel)

1-09-3053